(No. 55039.—

*In re* FLOYD NORMAN NADLER, Attorney, Respondent.

*Opinion filed June 18, 1982.*

UNDERWOOD and MORAN, JJ., dissenting.

Mary M. Conrad, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for respondent.

JUSTICE CLARK delivered the opinion of the court:

On September 5, 1979, the respondent, Floyd Norman Nadler, was convicted in the United States District Court for the Northern District of Illinois of submitting a false income tax statement. He was fined $5,000 and placed on

probation for two years. The probationary period was later reduced to one year. Respondent's conviction was affirmed on appeal.

On January 30, 1980, this court, pursuant to Rule 761 (73 Ill. 2d R. 761), entered an order suspending respondent until further order of the court. The current proceeding was brought by the Administrator of the Attorney Registration and Disciplinary Commission to determine whether respondent's crime warrants discipline and, if so, the extent of discipline. Since respondent acknowledges that discipline is warranted, the only issue before this court is the measure of discipline to be imposed.

The hearing panel recommended that respondent be suspended for two years. The Review Board recommended suspension for three years and until further order of this court. Both the Administrator and respondent excepted to the report and recommendation of the Review Board. Respondent argues that the sanction is unduly harsh; the Administrator contends it is too lenient and urges disbarment.

Respondent was admitted to practice in Illinois on May 21, 1959. Until his suspension he practiced in the Chicago area, principally in the field of matrimonial law.

The conviction and the other charges against respondent arise from his acting as attorney in certain private adoptions between 1972 and 1975. The testimony before the hearing panel showed that, in 21 of the 23 private adoptions respondent handled during this period, illegal cash payments were made by the adopting couple to the physician who provided the baby. In each case, the cash was given to respondent to transmit to the physician. These cash payments were omitted from the schedule of expenses prepared by respondent that was required to be filed with the circuit court when an adoption was approved. The respondent caused the adopting couples to sign false affidavits stating that no fees other than those

listed in the schedule had been paid in connection with the adoption, and submitted these affidavits to the circuit court.

Respondent testified that private adoptions were only a small part of his practice. His usual fee for handling an adoption was a flat $500, and such fees amounted to no more than 4% of his gross receipts annually.

The first adoption respondent handled was accomplished without illegal payment being made. Thereafter, respondent testified, the doctors demanded a cash premium, varying from $500 to $5,000, for providing a baby for adoption, in addition to the usual fee for medical services in delivering the child. There appear to have been several obstetricians who dealt with respondent on a regular basis. Typically, they would call respondent shortly before a patient who wished to give up her baby was to deliver and inform him that the infant would be available for adoption at a certain time. Respondent testified that he regularly, indeed continually, received calls from couples seeking to adopt children. When respondent learned that an infant was available for adoption, he would call an interested couple. The couples were informed that the physician would require a premium in cash in addition to the medical fee.

Respondent testified that he was aware of the Illinois statute prohibiting the payment and the acceptance of compensation other than usual medical or legal fees in connection with a private adoption. (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—21, now Ill. Rev. Stat. 1979, ch. 40, par. 1526.) Though he never explained the statute to the adopting couples, he testified that he believed they were aware that the cash payments were illegal.

The adopting couple typically would bring the cash in an envelope to respondent's office and hand it over to respondent, who later, when the adoption was completed, passed it on to the doctor. Respondent testified that he

was merely a conduit for the illegal payments, and that, with one exception to be discussed, he transmitted all cash so received to the doctors.

Among the legal documents prepared by respondent for an adoption was an affidavit attesting that the expenses listed were the only ones paid in connection with the adoption. The affidavit was required by rule of the circuit court of Cook County. Respondent would instruct the adopting couple to sign the affidavit; he as their attorney would also sign it. The illegal payments to the physicians were never included in these affidavits. Respondent testified that the adopting couples were aware that the affidavits they signed were false. Respondent testified that he did not instruct the couples to lie to the court if they were questioned about the truth of the statements in the affidavit. He admitted, however, that on several occasions, in response to questions by the court, adopting couples did state falsely that the affidavits were complete and accurate. On these occasions respondent, though present, remained silent. This constituted a fraud upon the court.

In 1974, respondent handled an adoption for a couple named Kujak. Respondent testified that a tentative arrangement had been made for the Kujaks to adopt a baby which would be born in November. The obstetrician was demanding a $2,500 cash premium, and respondent had informed the Kujaks of this. In October, however, respondent learned from a different doctor of a newborn which was available for immediate adoption. He asked the Kujaks whether they would prefer to adopt this infant rather than the one originally discussed, and the Kujaks agreed that they would.

When the Kujaks arrived at respondent's office to execute the adoption papers, Mr. Kujak handed respondent an envelope containing $2,500. However, the obstetrician who delivered the baby ultimately adopted by the Kujaks

had told respondent that no cash premium would be required. Nevertheless respondent accepted the envelope with the money. Though he later had contact with the Kujaks, respondent neither returned the money to them nor mentioned that it had not been needed to pay off the doctor. Respondent testified that he considered returning the Kujaks' money but ultimately kept it and used it.

Respondent's failure to report this $2,500 as income on his Federal tax return for 1974 led to his conviction in 1979 for tax evasion. During his Federal trial, respondent filed an amended return and paid the tax due and interest. At about the same time he returned the $2,500 to the Kujaks.

At the hearing, a number of respected attorneys and a circuit judge testified to respondent's high integrity and good moral character. In addition, 110 affidavits to the same effect were received in evidence.

Dr. Bernard Suran, a clinical psychologist who gave marital counseling to respondent and his wife in 1977, testified as an expert witness for respondent. According to Dr. Suran, respondent suffers from a personality disorder known as an "accommodating personality." Dr. Suran defined "accommodating personality" as a person with low self-esteem, who will go to great lengths, including taking personal risks, to obtain the approval and respect of others. He described it as a mild form of mental disorder. In Dr. Suran's opinion, respondent's conduct in the adoptions was not motivated by greed, but rather by his need to win the esteem and approval of others. Since respondent sought treatment, Dr. Suran testified, he had made progress in overcoming his difficulties, and his prognosis was good.

The hearing panel, in recommending that respondent be suspended for two years, found that "the conduct of respondent in spending money that was never his, in consistently deceiving the court in adoption cases, and in fail-

ing to report $2,500 of illegally received income, requires a severe penalty." It agreed with Dr. Suran that "respondent is a safe risk as far as future transgressions are concerned."

The Review Board, in recommending a suspension of three years and until further order of the court, noted that the charges against respondent were serious. Respondent had been convicted of a crime involving "dishonesty, fraud, deceit, or misrepresentation" in violation of D.R. 1—102(A)(4) of the Illinois Code of Professional Responsibility (Illinois State Bar Association (rev. ed. 1977)). In filing false affidavits regarding the adoptions, respondent established a pattern of violating D.R. 1—102(A)(5) and D.R. 7—102(A)(3), (A)(4), (A)(6), and (A)(7) (Illinois State Bar Association (rev. ed. 1977)). In retaining his clients' money for his own use, respondent violated D.R. 9—102(A) (Illinois State Bar Association (rev. ed. 1977)).

The Review Board recognized a number of mitigating factors. It noted that respondent had acknowledged the seriousness of the charges against him, expressed regret for his misconduct, and recognized the appropriateness of discipline. It accepted respondent's testimony and the testimony of Dr. Suran that respondent's conduct in the adoptions, though improper, was not motivated by greed. To the extent that respondent's emotional problems contributed to his improper conduct, respondent had sought treatment and showed progress in overcoming them. While retaining a client's money was, in itself, a serious matter, the Review Board observed that respondent's misappropriation of the Kujaks' money appeared to be an isolated incident, that restitution had been made, and that no complaint was filed against respondent by the Kujaks. The Board also gave consideration to the character testimony of the witnesses and the affidavits.

Counsel for both sides agree that discipline is appro-

priate. The question is one of degree. The Administrator argues that the magnitude of respondent's misconduct warrants disbarment. Respondent contends that the sanction imposed by the Review Board is unduly harsh.

It is well settled that this court has the final responsibility for determining the discipline to be imposed on an attorney found guilty of professional misconduct. The purpose of a disciplinary proceeding is to safeguard the public, to maintain the integrity of the profession, and to protect the administration of justice from reproach. (*In re Saladino* (1978), 71 Ill. 2d 263, 275; *In re Lacob* (1972), 50 Ill. 2d 277, 279.) In determining the sanction that is appropriate to serve this purpose, this court has been concerned both to achieve uniformity and evenhandedness in the application of discipline, and to consider each individual case on its own merits. *In re Chapman* (1978), 69 Ill. 2d 494; *In re Andros* (1976), 64 Ill. 2d 419.

The Administrator cites a number of cases as relevant to the issue of what measure of discipline is appropriate, referring to statements in our opinions that uniformity and fairness require the court to compare the conduct of this respondent with that of others. (*In re Saladino* (1978), 71 Ill. 2d 263; *In re Cook* (1977), 67 Ill. 2d 26.) After reviewing these cases, however, we find that none involved a pattern of conduct or surrounding circumstances sufficiently analogous to this respondent's to be determinative of the sanction to be imposed in this case. Moreover, " '[t]he doctrine of *stare decisis* cannot really be applied to the particular discipline meted out in any particular case, as the conduct of each respondent must be judged individually,' and 'the discipline in each case must turn upon the particular factual situation presented.' " *In re Leonard* (1976), 64 Ill. 2d 398, 404, quoting *In re Nesselson* (1966), 35 Ill. 2d 454, 461.

Respondent's misconduct is of a serious nature. We agree with the hearing panel and the Review Board, how-

ever, that a repetition of the misconduct is most unlikely. Respondent has obtained treatment for the emotional problems that may have contributed to his misconduct and has made progress in overcoming them. His awareness of the gravity of his misconduct and his remorse seem genuine. Before the hearing panel he stated his intention, if allowed to return to the practice of law, not to handle any private adoptions in the future. As the hearing panel recognized, the present disciplinary proceeding is the first complaint of professional misconduct by respondent in some 20 years of practice. An impressive number of reputable attorneys, clients and former clients, and a circuit judge are convinced of respondent's good moral character and high integrity.

In view of the foregoing mitigating factors, the sanction of disbarment urged by the Administrator would be unduly harsh. The sanction of suspension imposed by the hearing panel and the Review Board indicate their belief that respondent, despite his past misconduct, is capable of acting with integrity as an attorney in the future. There is no purpose in imposing a sanction that benefits neither the public nor the legal profession. (*In re Leonard* (1976), 64 Ill. 2d 398, 406.) Since respondent has been under an order of interim suspension since January 30, 1980, we believe that a suspension of three years from the date of the filing of this opinion is appropriate.

*Respondent suspended.*

JUSTICE UNDERWOOD, dissenting:

In my judgment nothing short of disbarment is appropriate for a lawyer who in 21 of 23 adoptions handled by him in a three-year period regularly encouraged his clients to commit perjury and to violate the statute prohibiting payment of compensation to private persons for the placement of "black market" or "gray market" babies; who then filed the perjurious affidavits with the courts,

advised some clients to lie to the judge if asked about them and remained silent when his clients were asked and answered falsely; and who finally converted $2,500 of one client's funds. While characterizing respondent's conduct in these terms may seem harsh, the fact is that he was systematically and regularly assisting his clients in deceiving the judges before whom they appeared and in committing serious violations of the law without, apparently, any explanation to them of the possible consequences of their conduct.

Given the fact that respondent's testimony leaves no doubt that he completely understood the situation, I find the psychologist's testimony regarding respondent's "accommodating personality" disorder insufficient to establish any real excuse for what was done. Nor, in my opinion, can the evidence as to respondent's prior reputation and good character warrant limiting the sanction imposed here to suspension. *In re Rosenthal* (1978), 73 Ill. 2d 46.

The fact that respondent may have been motivated, at least in part, by a desire to provide babies for couples who could not secure them by legitimate methods cannot serve to justify the deliberate and long-continued violation of the adoption and criminal laws of this State. But, even assuming respondent's motives for those violations sufficient to warrant a sanction less than disbarment, nothing of a mitigating nature can be said of the conversion of the Kujak funds. *In re Smith* (1976), 63 Ill. 2d 250.

While I find the disbarment of an attorney a most unwelcome duty, it seems to me that in the aggravated circumstances of this case nothing short of disbarment will serve to maintain the integrity of the profession.

JUSTICE MORAN joins in this dissent.