(No. 57818.—

*In re* JAMES EUGENE ACKERMANN,
Attorney, Respondent.

*Opinion filed December 1, 1983.*

Theresa M. Gronkiewicz, of Chicago (John C. O'Malley, of counsel), for the Administrator of the Attorney Registration and Disciplinary Commission.

Jack Toporek, of Chicago, for respondent.

JUSTICE MORAN delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a nine-count complaint before the Commission charging respondent, James E. Ackermann, with professional misconduct. All nine counts charged that he had neglected legal matters en-

trusted to him. The Hearing Board found respondent guilty on all counts. It also found that respondent had been addicted to alcohol during the period of time involved herein. It recommended that, in addition to being censured, respondent be placed on probation for two years. The Administrator filed exceptions with the Review Board, which had adopted the findings of the Hearing Board, but recommended that respondent be suspended for three years, that the order of suspension be stayed, and that he be placed on probation for three years. Respondent appeals from the report and recommendation of the Review Board.

One question is raised: Is the sanction recommended by the Review Board appropriate under the circumstances of this case?

Respondent, James E. Ackermann, has been practicing law in Illinois since 1962. This is the first time he has been the subject of a disciplinary proceeding. His professional problems are traced to a period of time beginning in 1974, shortly after the death of his law partner, and ending in 1980, when he voluntarily entered the alcoholic-treatment center at Lutheran General Hospital in Park Ridge. During this period he became addicted to alcohol and thereby became incapable of managing his personal and professional life. The nine-count complaint filed May 6, 1981, by the Administrator reflects a pattern of negligent management of legal matters beginning in 1974.

Counts I, IV, V and VIII involve dissolutions of marriage. Count I relates to the representation of Janet Hedger. Respondent received $100 towards a $250 fee. He prepared documents which were signed by the Hedgers in September of 1978. Subsequent to the preparation of these papers, respondent scheduled, but did not keep, various court dates. Mrs. Hedger met with respondent at

the Richard J. Daley Center on one of these scheduled court dates. She testified that respondent told her a new law eliminated the necessity of parties appearing before the judge to obtain a divorce. She was given papers to sign and was told that she was technically divorced. Several months later respondent informed her that she would have to appear in court for the divorce. A petition for dissolution of marriage was never filed. Mrs. Hedger ultimately was forced to retain new counsel in June of 1979.

The facts relevant to count IV are: Mary Wudtke, the wife of respondent's client Richard Wudtke, alleged that he neglected a dissolution-of-marriage proceeding. Respondent first met with the Wudtkes in February 1979. Mrs. Wudtke maintained that at a July 1979 meeting with the Wudtkes at the Richard J. Daley Center, respondent told Mrs. Wudtke to sign a property settlement and a *pro se* appearance form, and told her that the dissolution of marriage "would be all taken care of since an uncontested divorce did not necessitate a court appearance." Respondent denied this allegation, and the testimony of his client, Richard Wudtke, rebuts Mrs. Wudtke's statement. The petition for dissolution of marriage was dismissed for want of prosecution, the dismissal order was vacated, and the judgment of dissolution of marriage was entered on September 7, 1979.

The facts of count V set forth another failure by respondent to file a petition for dissolution of marriage. Respondent received a $200 retainer fee from Theresa Deering in December 1977. Although he prepared the necessary papers and began negotiations with an attorney representing Mr. Deering, he did not follow through, and eventually Mrs. Deering sought new counsel.

Count VIII involves both a dissolution-of-marriage case and a criminal battery charge which arose out of

the marital relationship. Respondent's client, Frank Marcus, paid him $172.56 in April 1980 to defend him in the criminal charge and represent him in the dissolution-of-marriage case. A default judgment was entered against Marcus in the dissolution-of-marriage case when respondent failed to appear or plead, necessitating the retention of new counsel to represent him. A public defender was eventually appointed by the court in the criminal case after respondent failed to make several scheduled appearances.

Counts II and VII involve neglect in the administration of estates. In count II, respondent failed to obtain transfer of title to twenty-five $100 United States Savings Bonds for his client, Mrs. Tillie Peters. He had been retained by Peters in July 1977 to represent her interest as sole legatee in the estate of Patrick Grace. He received a fee of $765 from his client and did prepare and file appropriate tax returns. He also resolved Peters' interest in a pension plan and an insurance policy. With regard to the savings bonds, respondent testified that he submitted improper forms to the Treasury Department. The bonds were returned to him, where they remained in his files from 1977 through 1979, when he resubmitted them to the Treasury Department.

The evidence relevant to count VII of the complaint indicates that respondent was retained by Raymond Beineman to settle the estate of Ida Smith, receiving $1,100 in attorney fees. Pursuant to this matter, he received a check in 1977 for $3,592.59 to be used to pay the inheritance tax. The check was never cashed but remained in his file until October 1979. He finally filed the inheritance tax return early in 1980 and has since reimbursed Beineman for the interest and penalties incurred as a result of the late filing. Respondent was also required to redeem $925 in Series E Savings Bonds regis-

tered in the name of Leon F. Smith with Ida Smith named as a co-owner. He testified that he prepared documents necessary for redemption but, as with the Grace estate, prepared them on the wrong form. Beineman eventually redeemed the bonds himself.

Counts III, VI and IX all involve real estate transactions. Respondent's representation of Northwestern Cutlery Supply Company is the subject of count III. Respondent had incorporated the business in 1975 and represented his client in the purchase of real estate later that year. Following the closing, he failed to record the deed evidencing the conveyance of the property. In addition, he did not comply with repeated requests for the return of all corporate records and materials pertaining to the real estate transaction. He testified that he lost the file. The client maintains that respondent never informed them or their new counsel that the file had been lost.

With regard to count VI, the evidence established that respondent was retained by Joseph Sekera in August 1977 to negotiate the sale of one property and the purchase of another. Pursuant to the sales transaction, respondent was to hold $800 in escrow to pay the 1977 taxes on the property when they became due, as well as the prorated 1978 taxes. Any excess funds on deposit after payment of the taxes were to be returned to Sekera. Respondent failed to pay the tax bills. Sekera learned of the delinquent tax bills in May of 1979, and upon contacting respondent he was assured that respondent would take care of the matter. The combined tax bill was $661.30. Respondent sent Sekera a check for $138.70 but failed to pay the tax bill. The mortgagee eventually paid the taxes. In November 1980 Sekera filed a complaint against respondent with the Attorney Registration and Disciplinary Commission. Respondent repaid the

mortgagee in January 1981, including interest and penalties incurred.

Count IX involves a matter similar to count III. Respondent was engaged in 1974 by Mr. and Mrs. Frank Munaretto to represent them in the purchase of real estate. As in count III, respondent prepared the necessary documents and handled the closing but failed to record the conveyance. He also neglected to record the release of the seller's mortgage and to obtain title insurance on the property. The clients were required to retain other counsel to represent them in these matters.

Respondent argues that all counts in the complaint can be traced to behavior symptomatic of organic brain syndrome due to repeated intoxication. Memory lapses, poor judgment, procrastination and inability to meet deadlines or perform duties are all characteristic of this syndrome. In addition, he points to the 14 years prior to the addiction when he practiced law without difficulty, as well as the past three years when he has adhered to strict rehabilitation. Respondent testified, as did his wife and sister, regarding his gradual reliance on alcohol. He traces his heavy drinking to the death of his brother in 1969 and his law partner in 1973.

On September 29, 1980, respondent voluntarily admitted himself to the alcoholic-treatment center at Lutheran General Hospital. His treatment involved three weeks of hospitalization and six weeks of outpatient care. As part of this program he became a member of Alcoholics Anonymous. He has abstained from drinking since admission to the hospital. The psychiatrist who directs the program at the hospital testified that respondent is in remission, with the chance of recurrence decreasing with time. Respondent is said to be conducting his life in a "normal" fashion. This includes interrelating with family and friends, as well as conducting his prac-

tice in a "responsible manner."

The facts in this case are not in dispute. The evidence has clearly and convincingly shown, and the respondent has admitted, virtually every factual allegation in the complaint. From our review of the record, we agree with the hearing and review boards that respondent has been guilty of repeated acts of negligence toward clients who relied on him to represent them in legal matters.

The final decision of what sanction is appropriate in a disciplinary action rests with this court. (*In re Chapman* (1983), 95 Ill. 2d 484, 492; *In re Kink* (1982), 92 Ill. 2d 293, 302; *In re Hopper* (1981), 85 Ill. 2d 318, 323.) The conclusions of the Hearing Board and Review Board serve as recommendations. While a determination of the proper sanction involves analysis of the facts and circumstances of the particular case, "where the facts are similar to those in other cases, a uniform standard of discipline should be sought." *In re Feldman* (1982), 89 Ill. 2d 7, 11; *In re Kink* (1982), 92 Ill. 2d 293, 302; *In re Clayter* (1980), 78 Ill. 2d 276, 283.

This court has consistently found that "neglect in the performance of an attorney's duties to a client can be sufficient to warrant disciplinary action." (*In re Berkos* (1982), 93 Ill. 2d 408, 413; *In re Chapman* (1978), 69 Ill. 2d 494, 501; *In re Taylor* (1977), 66 Ill. 2d 567, 571.) " 'The traditionally high standards of the legal profession impose upon an attorney the duty to represent a client with zeal and diligence.' " (*In re Kink* (1982), 92 Ill. 2d 293, 302; *In re Chapman* (1978), 69 Ill. 2d 494, 501.) Respondent's conduct in relation to the nine counts involved in this case was clearly in violation of this standard.

A number of disciplinary cases that have come before this court reflect misconduct similar to that presented in the instant case. In *In re Levinson* (1978), 71 Ill. 2d 486,

an attorney was suspended for a period of six months and until further order of the court. There, respondent failed to proceed in an adoption proceeding and misrepresented facts to his clients, resulting in a substantial delay in finalizing the adoption. A legal-assistance agency ultimately completed the proceedings three years later.

Additionally, respondent failed to pay his attorney registration fee, to answer the complaint or to appear before the hearing or review boards. Although the respondent alluded to his son's terminal illness, which he said required almost constant attention, he never presented any evidence to the disciplinary bodies and made no showing to the court that the son's illness existed during the relevant period. Unlike Levinson, the respondent in the instant case has been cooperative with the investigatory bodies. Moreover, he has offered substantial evidence of his alcohol dependency and his subsequent rehabilitation, as well as the direct effect his disability had on his professional conduct.

The attorney in *In re Levin* (1979), 77 Ill. 2d 205, was suspended for three months for neglect in the handling of a personal injury case. He failed to file answers to interrogatories, resulting in the dismissal of one defendant. In addition, he failed to finalize a settlement and failed to produce his client for a deposition, which resulted in the case being dismissed. No significant evidence was offered in mitigation.

Respondent in *In re Johnson* (1982), 93 Ill. 2d 441, received a sanction of suspension for one year for two instances of negligent conduct. In a divorce proceeding, he failed to enter a dissolution-of-marriage decree. In the administration of an estate, he failed to make a final report and account, which failure resulted in the issuance of contempt citations against his client and additional expenses for the estate. No evidence was offered in mitiga-

tion. Although the type of misconduct displayed in *Levin* and *Johnson* is similar to that involved in the instant case, the failure of the respondents in the former cases to offer significant evidence in mitigation serves to distinguish them from the case at bar.

We find the patterns of conduct in *In re Taylor* (1977), 66 Ill. 2d 567, and *In re Simpson* (1971), 47 Ill. 2d 562, most analogous to the case at bar. *Simpson* and *Taylor* involved multiple acts of attorney negligence. The attorneys in *Simpson* and *Taylor* were each suspended for one year for neglecting legal matters entrusted to them by clients who had advanced money for fees and costs. Simpson failed to commence a divorce action and remained *incommunicado* from his client for a period of two years. In addition, he retained money entrusted to him for the purpose of procuring a surety bond. The court characterized this behavior as "tantamount to a 'designed fraudulent conversion', rather than lax business methods." *In re Simpson* (1971), 47 Ill. 2d 562, 567.

Although Simpson claimed domestic difficulties and alcoholism as mitigating factors, there did not appear to be any evidence of rehabilitation from the alcohol dependency. Moreover, in contrast with this case, Simpson displayed an unwillingness to cooperate throughout the disciplinary proceedings.

The attorney in *In re Taylor* (1977), 66 Ill. 2d 567, also failed to perform or complete legal services after accepting fees. Specifically, he failed to appear at a scheduled hearing in a criminal case, neglected to commence a divorce action, and failed to follow through in a wrongful death case. Taylor argued that *any* sanction was inappropriate in a disciplinary case based on neglect. Moreover, he challenged the constitutionality of Canons 6 and 7 of the Code of Professional Responsibility. No evi-

dence, however, was offered in mitigation of the charges against him.

When deciding attorney discipline cases involving neglect, this court has imposed all sanctions provided by our Rule 771 (87 Ill. 2d R. 771). The sanctions include censure (*In re Ahern* (1961), 23 Ill. 2d 69; *In re Kink* (1982), 92 Ill. 2d 293), suspension (*In re Simpson* (1971), 47 Ill. 2d 562; *In re Taylor* (1977), 66 Ill. 2d 567), and disbarment (*In re Clark* (1956), 8 Ill. 2d 314). In *In re Chapman* (1983), 95 Ill. 2d 484, a neglect case, this court, utilizing its inherent authority to impose discipline not provided for by Supreme Court rule, ordered a sanction of "probationary suspension."

The respondent in *Chapman* was found to have neglected an appeal and had been disciplined on two prior occasions for similar misconduct. The court, however, took into consideration a former alcohol-abuse problem which, at the time of hearing, was said to be under control. It therefore imposed a two-year suspension to be stayed during a concurrent period of probation. The court relied heavily on the reasoning followed in an earlier case, *In re Driscoll* (1981), 85 Ill. 2d 312.

In *Driscoll,* the respondent converted the proceeds of his clients' settlement, which he had been ordered to deposit in the clients' account. Repeated demands were made for the money. In order to pay the first clients the funds to which they were entitled, respondent converted the funds of another client. Driscoll introduced substantial evidence that he was an uncontrolled alcoholic at the time of his offenses. In addition, he presented convincing evidence of his rehabilitation. Although the court stated that the nature of respondent's behavior would normally warrant disbarment, it was willing to take into consideration the effect alcohol addiction had on the attorney's behavior and the evidence of his rehabilitation. "[A]s an

experiment in dealing with impaired attorneys'' (85 Ill. 2d 312, 317), Driscoll was given a six-month suspension and was ordered to continue his rehabilitation program under the supervision of the Attorney Registration and Disciplinary Commission following his suspension.

Courts and professional organizations throughout the nation are taking steps to deal with the problems of the alcoholic or "impaired" attorney. This court has adopted a new rule—Rule 772 (94 Ill. 2d R. 772)—which codifies and expands upon the experimental sanction imposed in *Chapman*. This rule, which became effective October 1, 1983, provides for probation for a specified period of time, or until further order of the court, in conjunction with a suspension which, in certain cases, may be stayed in whole or in part. This type of sanction may be imposed by the court if the attorney demonstrates that he:

> "(1) can perform legal services and the continued practice of law will not cause the courts or profession to fall into disrepute;
>
> (2) is unlikely to harm the public during the period of rehabilitation and the necessary conditions of probation can be adequately supervised;
>
> (3) has a disability which is temporary or minor and does not require treatment and transfer to inactive status; and
>
> (4) is not guilty of acts warranting disbarment." (94 Ill. 2d R. 772(a).)

In addition, an attorney placed on probation will have to comply with the specific conditions of probation set out in the court's order.

Respondent has offered substantial evidence that he was under the influence of alcohol from 1974 through 1980 and that the greater part of his misconduct was traceable to behavior symptomatic of his alcoholism. The evidence of alcohol dependency and subsequent rehabilitation, in the instant case, closely parallels that found in *Driscoll*. The mis-

68

conduct of respondent, however, is not as egregious as that displayed by the respondent in *Driscoll*. Moreover, respondent has shown more of a causal link between his alcoholism and the negligent pattern of misconduct than the respondents in either *Driscoll* or *Chapman*. We find respondent's voluntary admission to the alcoholic-treatment center prior to the initiation of disciplinary proceedings especially impressive. Further, he has demonstrated an understanding and appreciation of his wrongdoing and has expressed regret. Finally, he has repaid all clients for unearned fees, as well as any penalties or interest they may have incurred due to his neglect.

This court recognizes the value of considering alcoholism as a mitigating factor in cases where there is detailed evidence to link the attorney's drinking to his misconduct. (*In re Driscoll* (1981), 85 Ill. 2d 312, 315.) Nonetheless, *Driscoll* recognized alcoholism as diminishing responsibility, not eliminating it. "[O]ur duty to uphold the standards and reputation of the profession is not incompatible with sympathy and leniency for victims of alcoholism. But their tragedy cannot be used as a license to exploit clients by taking their money." (85 Ill. 2d 312, 316.) The behavior referred to in *Driscoll* was conversion rather than the neglect involved in the instant case. We cannot overlook, however, the inconvenience and financial hardship respondent's misconduct has caused the clients involved.

"The purpose of a disciplinary proceeding is to safeguard the public and maintain the integrity of the legal profession." (*In re Levin* (1979), 77 Ill. 2d 205, 211.) With this goal in mind, we have considered the sanctions imposed in the analogous cases discussed above, along with the strong mitigating circumstances of the instant case. In addition, we have given consideration to the position taken by the Administrator in oral argument before this court. The Administrator acknowledged that respondent's miscon-

duct was far less egregious than that evidenced in *Driscoll* and that respondent had provided substantial evidence of impairment and voluntary recovery, unlike the respondent in *Taylor.*

The Administrator, therefore, recommended a six-month suspension, that the suspension be stayed, and that respondent be placed on probation for a period of two years. We adopt this recommendation as an appropriate sanction in this case and so order. In addition, as a condition of probation, respondent is to completely abstain from the use of alcohol.

*Suspension ordered but stayed;*
*conditional probation entered.*