(No. 59134.—

*In re* J. EARL CRISEL, Attorney, Respondent.

*Opinion filed March 23, 1984.*

Daniel Drake, of Springfield, for the Administrator of the Attorney Registration and Disciplinary Commission.

John L. Swartz, of Giffin, Winning, Lindner, Newkirk, Cohen & Bodewes, P.C., of Springfield, for respondent.

JUSTICE MORAN delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission filed a complaint charging respondent, J. Earl Crisel, with conduct tending to bring the courts and the legal profession into disrepute. The charge was based on respondent's involvement in a series of acts occurring between May and October of 1980. The Hearing Board found respondent guilty of intentionally engaging in conduct which involved dishonesty, fraud, deceit and misrepresentation and was prejudicial to the administration of justice, as well as tending to bring the legal profession into disrepute. It also found that the actions of respondent were a result of his depressive neurosis and, as such, recommended that respondent be censured. The Administrator and the respondent filed exceptions with the Review Board. A majority of the Review Board recommended that the complaint be dismissed. Two members of the Review Board did not participate and two members filed a dissenting report, recommending a two-year suspension, to be stayed by placing respondent on two years' probation. The Administrator appeals from the report and recommendation of the Review Board.

There is but one issue raised: What, if any, sanctions should be imposed under the circumstances of this case?

Respondent was admitted to the Illinois bar in 1973 and has served as the State's Attorney of Edwards County since 1976. The conduct at issue took place in 1980 when respondent was seeking reelection to the State's Attorney position. Respondent was reelected in 1980. During oral argument, the court was informed that respondent was seeking reelection in 1984.

Late in the evening of May 24, 1980, respondent got into his car and drove to a remote spot near the Little Wabash River, intending to commit suicide. Unable to carry out this plan, he fired his shotgun twice into his automobile. Early the following morning, respondent contacted the Edwards County sheriff's department, relaying a fabricated report that he had been shot at by unknown persons. The sheriff's department, aided by special agent Michael Braun, of the criminal investigation division of the Illinois Department of Law Enforcement, began an extensive investigation of the alleged attack.

Agent Braun testified that, while respondent did not direct the investigation, he was fully aware that it was being conducted and was present during some of the investigation. A photograph entered into evidence depicts a scuba diver searching in a river for the firearm used in the "attack" while respondent stood watching on the riverbank. Braun's testimony revealed that, in addition to the underwater search, his investigation included interviews of individuals who were in the area of the claimed attack and had heard gunshots, interviews with people thought to have a strong dislike for respondent, and a simulation of the alleged attack.

It soon became clear that the evidence collected did not substantiate the report submitted by the respondent. On July 28, 1980, agent Braun confronted respondent with this information. He did not change his story, but agreed to take a polygraph examination. When Braun

contacted respondent on August 27, 1980, to tell him that the polygraph examination was scheduled, respondent indicated that he had more to tell Braun about the case. The following day, they met, and respondent told Braun that he had been the victim of an extortion plot. Respondent told Braun that because of his depression over the extortion plot, he contemplated suicide but instead shot at his own car. Braun advised respondent that the FBI would probably be contacted regarding the extortion and that there would most likely be a news release regarding the incident.

Respondent left town, for approximately a week in late September, without telling anyone that he was leaving or where he could be found. Law-enforcement officials in the area initiated a search. The testimony of the respondent indicates that the disappearance was prompted when he learned that the local media were going to release a story containing the "true facts" involved in the attack on his automobile. Respondent further testified that it was during this period that he decided to seek psychiatric care. He was referred to Dr. Gordon Smith, a psychiatrist, and began seeing him every two weeks with the frequency of his visits eventually decreasing to once a month and then once every six weeks. At the time of the hearing, respondent and Dr. Smith no longer adhered to a specific schedule but would meet when respondent "felt the need."

When respondent returned to town in the beginning of October, he contacted Braun. He admitted that his August 28, 1980, confession was true except for the portion regarding the extortion. Braun stated that respondent said he used the extortion story "as a crutch to give the law enforcement officials some justification for his actions." At that time, Braun informed respondent that a special prosecutor would be appointed. Respondent was charged with official misconduct but these charges

were subsequently dismissed. He was then charged with disorderly conduct for knowingly transmitting a report to a police officer that the offense of assault had been committed, knowing at the time of such transmission that there was no reasonable ground for believing that such an offense had been committed (Ill. Rev. Stat. 1979, ch. 38, par. 26—1(a)(4)). Respondent pleaded guilty to this charge and was fined $500 and placed on court supervision for 90 days. He was subsequently discharged from supervision and the charges filed against him were dismissed.

Respondent called a psychiatrist, Dr. Glenn Pittman, to testify on his behalf. Dr. Pittman had been retained to prepare a psychiatric evaluation of respondent. He examined respondent and reviewed the notes of Dr. Smith. Dr. Pittman's diagnosis of depressive neurosis was consistent with Dr. Smith's findings. Dr. Pittman stated that respondent's depressive disorder was of the most severe type because of his suicidal tendencies. It was the doctor's opinion that, because of the depressive illness, respondent was suffering from impaired judgment at the time he fired the shots and fabricated the explanation. Dr. Pittman characterized the fabrication as "an attempt to somehow bring order out of disorder *** trying to make a bad situation a little better for himself ***."

On the basis of psychological testing performed to better evaluate respondent's personality profile, he classified respondent as an obsessive-compulsive personality type, "a perfectionist to defend against anxiety *** who needs routine and order to function best." The psychological report, which was entered into evidence, also indicated that respondent "continues to struggle with significant feelings of inferiority, guilt, tends to worry and ruminate excessively *** [and] during times of heightened depressions *** would likely *** [show] an increase in morbid thinking and perhaps a decrease in good judg-

ment." The doctor noted that an obsessive-compulsive personality was common among professionals. He further testified that individuals with a depressive neurosis, especially those who are obsessive compulsive, may be able to function competently at their work. It was Dr. Pittman's opinion that, as of September 1982, respondent's condition was improved, with suicidal thoughts no longer present. When asked if respondent was able to function normally as a professional, Dr. Pittman replied affirmatively, finding nothing, on the basis of his interviews, which would interfere with respondent's functioning as a lawyer. On cross-examination, the doctor did state, however, that depression and suicidal tendencies could reoccur.

A number of character witnesses were called on respondent's behalf. These included the Edwards County sheriff, several attorneys, and a local bank official. They all attested to respondent's good standing in the community as well as his professional competence.

This court has consistently imposed discipline in cases where an attorney's conduct has involved dishonesty, fraud, deceit or misrepresentation. (See, *e.g., In re Mehta* (1980), 83 Ill. 2d 18; *In re Mitan* (1979), 75 Ill. 2d 118; *In re Sherre* (1977), 68 Ill. 2d 56.) Moreover, the underlying conduct may arise outside the practice of law. *In re Lamberis* (1982), 93 Ill. 2d 222, 226; *In re March* (1978), 71 Ill. 2d 382, 391; *In re Melin* (1951), 410 Ill. 332, 337.

Thus, in *In re Lamberis* (1982), 93 Ill. 2d 222, the court censured the respondent for submitting a master's thesis which incorporated plagiarized excerpts from two published works. Recognizing that there was "no violation of law or fraud on the court," the court, nevertheless, found that "sanctions [were] appropriate and required because both the extent of the appropriated material and the purpose for which it was used evi-

dence[d] the respondent's complete disregard for values that are most fundamental in the legal profession." 93 Ill. 2d 222, 226-27.

The misconduct of the respondent in the instant case, like the misconduct of respondent Lamberis, does not stem from an attorney-client relationship. Unlike the situation in *Lamberis,* however, the instant conduct involves a violation of the law. As such, we find this case more analogous to attorney discipline cases which do not involve the practice of law but do involve "illegal conduct, fraud on the court, or situations closely analogous to those which an attorney confronts in the practice of law." 93 Ill. 2d 222, 226, and cases cited therein.

*In re Mitan* (1979), 75 Ill. 2d 118, is illustrative of an attorney discipline case involving a "fraud on the court." The respondent had intentionally falsified his application for admission to the bar, filed with the Committee on Character and Fitness. Nine misstatements and omissions were discovered. These included the denial of involvement in any civil or criminal proceedings when, in fact, the respondent had been involved in a number of civil suits, arrested on several occasions and convicted of a felony. The court characterized the respondent's actions as "[a] pattern of falsehood and deception *** calculated *** to frustrate any meaningful examination and investigation of the applicant's fitness to practice law." (75 Ill. 2d 118, 126.) The concealment of the prior convictions was found to be a fraud on this court. Considering this fraud in conjunction with all the other false and deceptive answers, the court concluded that disbarment was the appropriate discipline.

Conviction for failure to file income tax returns, while involving conduct arising outside the practice of law, has consistently been found to bring the legal profession into disrepute. (*In re Scheuneman* (1983), 99 Ill. 2d 106, 109; *In re Hopper* (1981), 85 Ill. 2d 318, 322; *In re Andros*

(1976), 64 Ill. 2d 419, 424.) After carefully considering the purpose of a disciplinary proceeding, the court in *Andros* imposed a one-year suspension on the respondent, who had been convicted of failure to file Federal income tax returns. The court stated that the object of a disciplinary proceeding is not punishment but rather the determination of "whether the attorney is a proper person to be permitted to practice his profession. [Citations.] The attorney is being disciplined not because of his conviction but because of the conduct." (64 Ill. 2d 419, 423.) Although the respondent in *Andros* presented evidence of emotional and marital problems in mitigation, the court found that the sanction of censure was inadequate and, therefore, imposed the one-year suspension.

Similarly, in *In re Hopper* (1981), 85 Ill. 2d 318, where the respondent had been convicted for failure to file income tax returns, the court took into consideration the respondent's evidence of emotional problems when imposing a sanction of censure. Respondent Hopper, like the respondent in the instant case, was diagnosed as suffering from a depressive neurosis and was treated by a psychiatrist. In its determination of an appropriate sanction, the court, in *Hopper*, compared the mitigation offered in *Andros* with the evidence in mitigation presented by respondent Hopper. While Andros had presented evidence of emotional strain, Hopper was afflicted with a diagnosed psychiatric ailment "which in effect paralyzed [him] and prevented him from filing his State returns." (85 Ill. 2d 318, 325.) In addition, Hopper did not intend to resume the practice of law. Accordingly, the court imposed the less severe sanction of censure.

This court strives to impose a uniform standard of discipline in cases involving similar types of conduct. Nevertheless, a final determination of the appropriate

sanction will necessarily involve analysis of the unique facts and circumstances of the particular case. (*In re Ackermann* (1983), 99 Ill. 2d 56, 63; *In re Hopper* (1981), 85 Ill. 2d 318, 324.) Although the cases discussed above provide some guidance in the resolution of the instant case, the unusual facts of this case demonstrate the necessity of independently evaluating the facts and circumstances of the case under consideration.

While the misconduct displayed by the respondent, in the instant case, is not factually similar to the cases analyzed above, comparisons may be drawn. In each case, the behavior has arisen outside the practice of law. All involve attorneys who have engaged in purposeful misrepresentations or violations of the law. All involve conduct which is contrary to the basic commitment to honesty intrinsic in a lawyer's oath of office. It would be an impossible task to assign a label to each disciplinary case which would precisely rank the severity of the conduct involved. Nevertheless, we find the conduct displayed by the respondent, in the instant case, at least as egregious as the behavior of the respondents in the analogous cases.

The facts in this case are not in dispute. Respondent, the ranking law-enforcement officer of Edwards County, engaged in a purposeful and extended pattern of misrepresentation which necessitated a needless four-month investigation by State and local officials. While the conclusions of the Hearing Board and Review Board serve as recommendations, this court will make the final determination of what sanction is appropriate in a disciplinary action. (*In re Ackermann* (1983), 99 Ill. 2d 56, 63; *In re Chapman* (1983), 95 Ill. 2d 484, 492; *In re Hopper* (1981), 85 Ill. 2d 318, 323.) After analyzing the attorney discipline cases involving dishonesty, fraud, deceit or misrepresentation, as well as the purposes of disciplinary proceedings, and the facts and circumstances of the in-

stant case, we conclude that some measure of discipline is warranted.

When determining the nature and extent of discipline to be imposed, the respondent's actions must be viewed in relationship "to the underlying purposes of our disciplinary process, which purposes are to maintain the integrity of the legal profession, to protect the administration of justice from reproach, and to safeguard the public." (In re LaPinska (1978), 72 Ill. 2d 461, 473.) Respondent maintains that, while the underlying conduct involved a "false police report," his behavior was solely a personal occurrence unrelated to his professional status and, therefore, professionally harmless. We find this position untenable. While this court is responsible for supervising the conduct of attorneys practicing in this State, " '*** we are interested in their private conduct only in so far as such relates to their professional competence or affects the dignity of the legal profession.' " (In re Lamberis (1982), 93 Ill. 2d 222, 227, quoting In re Serritella (1955), 5 Ill. 2d 392, 398.) Respondent's intentional misrepresentations were closely related to, and in complete contravention of, his responsibility as a State's Attorney, to enforce the law. These acts were evidence of his lack of professional and personal honesty, threatening the integrity of the legal profession and the administration of justice. We would not hesitate in imposing a substantial period of suspension if the evidence of psychological impairment had not been introduced.

The evidence is uncontroverted, however, that respondent was suffering from a depressive neurosis during the relevant period. We are not unsympathetic to the position, taken by the review and hearing boards and the respondent, that the psychological illness was the cause of the misconduct. The respondent was psychologically impaired at the time he fired the shotgun into his automobile and perpetrated the fraud on the law-enforce-

ment officials. Nevertheless, he was not incapacitated. He was able to function as a State's Attorney. As such, we cannot accept the proposition that the intentional misrepresentations made to the law-enforcement officials were totally the product of respondent's depressive neurosis. As this court has stated in attorney discipline cases involving alcoholism, where there is evidence linking the impairment to the misconduct, the impairment will be considered in mitigation, but will not act as a bar to discipline. (*In re Ackermann* (1983), 99 Ill. 2d 56, 68; *In re Driscoll* (1981), 85 Ill. 2d 312, 316.) The same rationale was followed in the case of *In re Hopper*, discussed above. The court considered Hopper's depressive neurosis as a mitigating factor rather than a bar to the imposition of a sanction.

The respondent was guilty of conduct which violated his oath of office as a lawyer and more specifically as State's Attorney of Edwards County. Such conduct cannot be condoned. Consideration has been given to the evidence of psychological impairment as well as the evidence of respondent's good character and professional ability. We find that the interests of justice will be best served by suspending respondent for three years. This suspension is to be stayed with respondent placed on probation for a concurrent period of three years.

While the testimony of the psychiatrist indicates that respondent's condition is improved, the possibility of a recurrence of the depressive neurosis was not ruled out. In light of the serious consequences which could result from such a relapse, we do not believe that psychiatric treatment should be left to the self-determination of the respondent. As a condition of probation, therefore, the respondent is to adhere to a specific program of psychological treatment. The Administrator, in conjunction with a psychiatrist of his designation and located reasonably convenient to respondent, is directed to prepare a pro-

gram of medical treatment designed to guard against the recurrence of the depressive neurosis. Provision should be made, in this program, for scheduled reporting to the Administrator by the doctor. The Administrator, in turn, shall report to the court any information regarding the respondent which he feels is significant. At the end of the probationary period, the Administrator shall submit a report to the court detailing respondent's progress and including a current psychological evaluation.

*Suspension ordered but stayed;*
*conditional probation entered.*