(No. 63424.—

*In re* ROBERT E. McAULIFFE, Attorney, Respondent.

*Opinion filed February 20, 1987.*

WARD, J., took no part.
MORAN, J., dissenting.

Sidney Z. Karasik, of Chicago, for respondent.

Robert A. Merrick, Jr., of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

JUSTICE SIMON delivered the opinion of the court:

The Administrator of the Attorney Registration and Disciplinary Commission (ARDC) charged the respondent with (1) conduct involving dishonesty, fraud, deceit, and misrepresentation, (2) illegal conduct involving moral turpitude, (3) conduct prejudicial to the administration of justice, and (4) making false statements to the ARDC with the intent to obstruct an inquiry. The charges stem from one central event—a settlement of a dispute over legal fees the respondent claimed were owing to him in which the respondent received a sum of money in exchange for a release and respondent's recantation of his prior sworn testimony.

The Hearing Board determined that there was "no doubt that the alleged intent on the part of the respondent to recant his sworn statement delivered to the Illinois Attorney Registration and Disciplinary Commission did in fact occur." That board, however, reached no conclusion as to whether the respondent's conduct constituted fraud, dishonesty, deceit or involved moral turpitude. It concluded only that, at "the very minimum, this [the misconduct] represents an unprofessional disregard

for the disciplinary proceedings of the respondent's profession." Extraordinary mitigating circumstances surrounding the respondent's misconduct led the Board to recommend a reprimand instead of a more severe sanction. The Review Board affirmed the Hearing Board's findings of fact and conclusions of law but determined that suspension for six months was appropriate. The respondent filed exceptions in this court to the Review Board's recommendations.

There is essentially no dispute over the facts. The disagreement between the ARDC and the respondent, Robert E. McAuliffe, a former judge of the circuit court of Cook County and for the past 7 years a Chicago attorney, is over the sanction to be imposed. The respondent's position is that, in view of the mitigating circumstances relied upon by the Hearing Board, discipline in excess of a reprimand would be inappropriate. The ARDC, however, urges us to suspend the respondent for three years. The record is replete, as the Hearing Board recognized, with tragic occurrences in the life of the respondent.

Judge McAuliffe was admitted to the Illinois bar in 1953. From 1959 to the end of 1963 he served as a judge of the village court of Maywood, and for the next 15 years as a judge of the circuit court of Cook County. In 1964 while the respondent was vacationing with his family in the west, his two young daughters were raped and murdered by a marauder who invaded their hotel room. For years this incident haunted the respondent and it eventually contributed to the severe depression from which he suffered.

The respondent's voluntary resignation from the bench in April 1979 was prompted by personal and financial hardship. He was heavily in debt due to imprudent business investments. In addition, he was supporting two households—one consisting of his first wife and daughter; the other of a son who was born in 1974 and

his son's mother, Charlotte, whom the respondent married after divorcing his first wife.

Upon leaving the bench, the respondent entered into a professional relationship with an attorney, Jason Mitan, who specialized in personal injury work. The respondent handled cases referred to Mr. Mitan and was paid $2,000 per week for the first eight or nine weeks of this arrangement so that he could meet his financial obligations. After this initial period, the respondent received a percentage of fees collected on the cases referred and was reimbursed for all overhead expenses. This relationship lasted only eight months; in December 1979 the respondent moved out of Mitan's office when he received notice that Mitan was being disbarred. Shortly thereafter, he entered into a similar arrangement with another attorney (attorney), who had represented Mr. Mitan in his disciplinary proceeding.

Around this time, the respondent's son and Charlotte moved to California. During the period the respondent was associated with the attorney, he commuted to California on a regular basis to see them. In February of 1981, while in California, the respondent received a letter from the attorney stating that he was terminating their business relationship and would not pay the respondent fees which the respondent was claiming were owed to him.

In April 1981, in an apparent effort to persuade the attorney to pay the amount he was claiming, the respondent filed a complaint with the ARDC accusing the attorney of using, without consent, waiver-of-attorney-lien forms that the respondent had signed in blank before leaving on a trip to California. He also provided the ARDC with a sworn statement supporting these charges. The respondent repeated these charges and added others during a citation deposition, in a civil case in which a party was seeking to locate Mr. Mitan's assets. Throughout this period, the respondent was distraught over his fi-

nancial situation and the attorney's alleged failure to live up to their agreement. On the advice of his physician, he contacted a psychologist whose diagnosis was that the respondent was suffering from a neurotic depression.

While visiting California in May 1981, the respondent's mental condition deteriorated. He began fearing that his son would be violently murdered as his daughters had been 17 years before. Obsessed by this fantasy, the respondent visited his son's school daily to assure himself that the child was still alive. His psychological problems became so severe that he stopped bathing and dressing properly. By late May 1981, Charlotte could no longer tolerate his bizarre behavior, and she asked the respondent to leave. He returned to Chicago to seek help from his psychologist.

On August 5, 1981, while in Chicago, the respondent had a heart attack and was hospitalized. Two days later, he sustained a second massive heart attack. The respondent had lost about 75 pounds and believed he had little time left to live. Following his discharge from the hospital, his psychologist diagnosed his illness as a major psychotic depression—a more debilitating condition than the neurotic depression the psychologist had diagnosed at the end of May. In September 1981, on the advice of his psychologist, the respondent admitted himself to the Illinois State Psychiatric Institute in order to receive antidepressant medication. Because of his heart condition, the physicians were unable to administer the drugs, and the respondent left the psychiatric hospital without being treated and against medical advice. That same day he experienced chest pains and was rehospitalized in the intensive-care unit of Northwest Community Hospital with a third heart attack.

While at Northwest Community Hospital, the respondent contacted the counsel representing the attorney in the negotiations to settle their fee dispute. The

respondent agreed to a settlement of approximately $24,000, to be paid in return for recanting the charges and statements he made to the ARDC, and for a complete release. On September 16, 1981, after being discharged from Northwest Community Hospital, the respondent went directly to the attorney's counsel's office where he signed an affidavit, without reading it, despite the warning from the counsel that the documents he was being asked to sign were "horrible." The affidavit recanted sworn testimony before the ARDC, rescinded the charges the respondent made against the attorney before the ARDC, and recanted a large portion of the testimony given in the citation deposition regarding the assets of Mr. Mitan. The respondent testified that he was convinced that his death was imminent and was willing to do anything to obtain the $24,000 so that he could return to California and be with his son before he died. Immediately after signing the documents, the respondent left Chicago with the money and attempted to drive to California. On the way, he lost consciousness somewhere in Wyoming and was hospitalized for a period of time. Upon his discharge, he continued on to California.

In September 1982, he was admitted to a Veteran's Administration hospital in California for treatment of his coronary condition and his psychiatric problems. During this hospitalization the respondent was assigned to the "Brain Damaged Ward," where he received antidepressant drugs. After this treatment, the respondent's physical and emotional health greatly improved. The respondent is presently employed as a part-time law clerk in a public office and also works part time for a law firm in Chicago.

The Administrator argues that the integrity of the legal profession and the protection of the administration of justice required that the respondent be subjected to substantial discipline. The Administrator stresses that

the respondent's recantation of sworn testimony involved fraud, deceit, dishonesty, and misrepresentation which typically justifies disbarment. While the Administrator concedes that mitigating factors may affect the severity of punishment, he argues that the respondent's reliance on his disabling emotional and physical condition to mitigate his misconduct is misplaced. Because the Hearing Board found that the respondent intended to recant his testimony in exchange for payment, the Administrator concludes that the respondent's judgment was not impaired at the time of his misconduct. The Administrator, therefore, distinguishes the instant case from *In re Crisel* (1984), 101 Ill. 2d 332, where this court imposed a lesser sanction in light of Mr. Crisel's neurotic depression and suicidal tendencies.

The Administrator's contention that the respondent's conduct constituted fraud is not substantiated. After listening to the live testimony and performing its fact-finding function, the Hearing Board did not state that the respondent acted fraudulently. It concluded only, as noted above, that "at the very minimum [the respondent's behavior constituted] an unprofessional disregard for the disciplinary proceedings of the respondent's profession." Cases on which the Administrator relies, such as *In re Mitan* (1979), 75 Ill. 2d 118, and *In re Carr* (1941), 377 Ill. 140, where there was fraud and stringent sanctions were imposed, are therefore not relevant here.

The Administrator's attempt to distinguish *In re Crisel* (1984), 101 Ill. 2d 332, on the ground that respondent's judgment was not impaired when he recanted his testimony also misses the mark. *Crisel* involved a State's Attorney who drove to a remote area intending to commit suicide. Unwilling to carry out his suicide plan, Mr. Crisel instead fired shots into his own automobile and then filed a police report claiming that he had been shot at by two unknown persons. After an investigation, the

police determined that Crisel had fabricated the report. Crisel, like the respondent in the instant case, had been diagnosed as suffering from a depressive neurosis which the Hearing Board concluded had contributed to his misconduct. In light of these findings, we stayed a two-year suspension and placed Mr. Crisel on probation explaining that "where there is evidence linking the impairment to the misconduct, the impairment will be considered in mitigation, but will not act as a bar to discipline." 101 Ill. 2d 332, 344.

The Administrator's assertion that *Crisel* is not applicable to the instant case, because the respondent's intent to recant his testimony demonstrates that his judgment was not impaired, distorts the evidence and misconstrues the Hearing Board's findings. The Administrator, as the Hearing Board explicitly noted, minimizes the severity of the respondent's mental and physical condition at the time of his misconduct. Within the period of less than two months, the respondent experienced three major coronary incidents and was confined in a locked ward in a State psychiatric facility. He left this hospital without receiving any treatment and against medical advice only to be rehospitalized the very same day with a third heart attack. It was during this hospitalization, convinced that his death was near, that the respondent agreed to sign an affidavit, which he never read, recanting his testimony.

The evidence clearly demonstrates that the respondent was psychologically and physically disabled at the time of his misconduct. We therefore conclude that the Hearing Board's finding that the respondent was mentally and physically impaired when he recanted his testimony is supported by clear and convincing evidence, and the Administrator's attempt to distinguish *In re Crisel* (1984), 101 Ill. 2d 332, on this ground ignores the Hearing Board's findings.

As we read *Crisel* it lends substantial support to the respondent's position that neither suspension nor probation are necessary in this case. In *Crisel,* we stayed a suspension and ordered probation because the respondent still required psychiatric treatment. Here, however, since the respondent has recovered from his psychological illness, probation is unnecessary. The Administrator's request that we suspend the respondent for three years is overly harsh both in the light of the extraordinary mitigating circumstances of this case and in view of the discipline imposed in cases such as *In re Crisel,* where the attorney's misconduct was linked to his disability. See also *In re Hopper* (1981), 85 Ill. 2d 318 (respondent censured because his failure to file income tax returns was tied to his psychiatric ailment).

In considering the appropriate discipline to be imposed in this case, we do not minimize the seriousness of respondent's misconduct. Recantation by an attorney of his sworn testimony in order to receive financial gain, even if the attorney is entitled to receive the gain, cannot be justified. We note, however, that the respondent's misconduct caused no real harm. There was no evidence that the ARDC had been investigating the attorney prior to respondent's initiation of charges. Further, the ARDC gave no indication that it attempted in any way to continue the investigation after the statements were recanted, nor that it would have pursued the charges had the respondent not recanted them.

Similarly, with regard to the respondent's recantation of portions of his citation deposition, the evidence reveals that the recanted statements had more to do with the personal controversy between the respondent, the attorney, and Mr. Mitan, than with the discovery of assets. There was neither an allegation nor proof that the cause of action of the plaintiff in the citation proceeding was prejudiced. In sum, the respondent used the ARDC as a

collection agency. While this constitutes improper conduct, it does not appear that anyone was substantially harmed as a result.

After reviewing the cases, "we find that none involved a pattern of conduct or surrounding circumstances sufficiently analogous to this respondent's to be determinative of the sanction to be imposed in this case." (*In re Nadler* (1982), 91 Ill. 2d 326, 333.) The respondent signed the affidavit as the Hearing Board observed, because of "a series of unusual personal tragedies, none of which are likely to repeat themselves." The respondent's successful rehabilitation is relevant in determining an appropriate sanction, as is his production of several witnesses who attested to his integrity. (See *In re Nadler* (1982), 91 Ill. 2d 326, 333.) In addition, we note the Hearing Board's finding that the respondent, despite his physical and psychological problems, never neglected the matters of his clients, and that there has been no other blemish on his career since his admission to the bar 33 years ago.

We do not believe that suspension is necessary either to safeguard the public or maintain the integrity of the legal profession (*In re Neff* (1980), 83 Ill. 2d 20, 25), and we conclude, as the Hearing Board did, that this one aberration in the respondent's long career at the bar does not indicate that he is an improper person to practice his profession. (83 Ill. 2d 20, 25.) We therefore find censure to be the appropriate sanction.

*Respondent censured.*

JUSTICE WARD took no part in the consideration or decision of this case.

JUSTICE MORAN, dissenting:

The Hearing Board found that respondent intentionally recanted a sworn statement to the Attorney Regis-

tration and Disciplinary Commission (ARDC). In other words, respondent intentionally lied to the ARDC. Normally such serious misconduct would warrant a substantial suspension or disbarment. (See, *e.g., In re Nadler* (1982), 91 Ill. 2d 326.) The substantial mitigating factors in this case are sufficient to convince me that neither disbarment nor a long suspension is appropriate. Nonetheless, I do not feel that censure alone is a sufficient sanction given the serious nature of the misconduct involved. In a similar case, *In re Crisel* (1984), 101 Ill. 2d 332, this court recognized the mitigating nature of the respondent's psychological problems but still imposed a three-year suspension, stayed pending completion of a concurrent three-year period of probation. The requirement in *Crisel* that the respondent undergo psychiatric treatment as a condition of probation was, in my view, an additional measure to safeguard the public; it was not, as the majority here suggests, the reason for imposing probation instead of censure. I believe that a similar approach is necessary in this case to adequately protect the public. However, since there is no need for lengthy ongoing psychiatric treatment, I would not impose as long a period of probation as in *Crisel*. Therefore, I would suspend respondent for one year, stay the suspension, and impose a concurrent one-year period of probation.