(No. 60244.—

*In re* THOMAS W. JORDAN, Attorney, Respondent.

*Opinion filed March 22, 1985.—Rehearing denied May 31, 1985.*

164

John C. O'Malley and Theresa M. Gronkiewicz, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte, of counsel), for respondent.

JUSTICE RYAN delivered the opinion of the court:

The respondent, Thomas W. Jordan, was admitted to the bar of Illinois in 1980. On April 8, 1983, the Administrator of the Attorney Registration and Disciplinary Commission filed a two-count complaint charging the respondent with making materially false statements and failing to disclose material facts in connection with his bar application. The Hearing Board recommended that the respondent be suspended from the practice of law for a period of three years. The Review Board concurred in the Hearing Board's findings that the respondent's conduct violated the disciplinary rules, but recommended that the respondent be disbarred. The respondent filed exceptions in this court pursuant to Rule 753(e)(5) (94 Ill. 2d R. 753(e)(5)).

The respondent contends that the findings and conclusions of the hearing and review boards are not supported by clear and convincing evidence and that the Review Board's recommendation of disbarment is excessive and not supported by the record as a matter of law.

In this State, a bar applicant is required by our rules to submit a verified application to the Committee on Character and Fitness. (87 Ill. 2d R. 708(b).) It is the duty of the applicant to fully and accurately respond to all questions posed in the application. Failure to do so has been held to constitute fraud on this court warranting the imposition of severe disciplinary measures. (*In re Ascher* (1980), 81 Ill. 2d 485, 499.) The initial burden is on the applicant to furnish the committee with evidence of his or her good moral character and general fitness to practice law. *In re Martin-Trigona* (1973), 55 Ill. 2d 301, 305.

Count I of the Administrator's complaint charged the

respondent with making materially false statements in answering his verified "Questionnaire and Statement of Applicant" (questionnaire) and failing to fully disclose certain other relevant facts. Count II charged the respondent with failing to advise the Committee on Character and Fitness about certain relevant events which arose after he filed his questionnaire.

The following questions and answers are relevant to count I of the Administrator's complaint.

Question 1(b) of the questionnaire asked the respondent to state every residence at which he had lived for the past 10 years. He was also to provide the exact address of each residence and the month and year he began and stopped living at each residence. When the respondent answered this question he failed to disclose that he had resided with his parents at 4600 South Lawler, Chicago, from 1956 to June 1971. The respondent's explanation for the omission was that he mistakenly thought that his parents had sold their house in April 1970. The respondent's address from February 1972 to June 1972 was 1331 North Dearborn, Chicago. He incorrectly listed the address as "1131" North Dearborn and incorrectly stated he resided at that address from June 1970 to June 1972.

There were three other addresses that the respondent did not list on his questionnaire: 441 West Barry, 1711 North Newland, and 4250 North Marine. These were all Chicago addresses which he had submitted to the Chicago police department as his residences when he was a police officer from 1970 to 1975. The respondent testified that he submitted the addresses simply to comply with the police department's residency requirement. Since he had not in fact resided at those addresses, he did not list them on the questionnaire.

Pursuant to a release signed by the respondent as part of his bar application, his Chicago police depart-

ment personnel file was made available to the Committee on Character and Fitness in June 1980. The three Chicago addresses, which were omitted from the respondent's questionnaire, were contained in his personnel file.

In addition, although it was not alleged in the Administrator's complaint, the respondent failed to state that he had lived at 3200 Sheridan Road, Chicago, with G. Paul Utley. The respondent testified that he had stayed at Mr. Utley's house on and off for about 15 months, apparently beginning in late 1976, when his parents were having marital problems.

Question 7 asked whether the respondent had ever worked in a law office or otherwise been employed by a lawyer. The respondent answered "No." He had, however, worked on and off for several companies owned by his father from the time he was 16 years old. The respondent did not disclose that while he was employed by his father he had done work for several attorneys. His duties included conducting investigations, taking statements of witnesses, and serving subpoenas. One of the attorneys the respondent worked for was W. Jason Mitan. The respondent testified that at the time he filed his questionnaire he was aware that Mitan had been disbarred. (*In re Mitan* (1979), 75 Ill. 2d 118.) He also failed to disclose that on several occasions he had been paid directly for his work by one or more of the attorneys. The respondent maintains that he was not employed by the attorneys. Instead, the attorneys hired his father's companies to do investigative work and process serving. The respondent contends he performed that work for the attorneys as an employee of his father's companies.

Question 10(a) asked the respondent to list all jobs he had after his 16th birthday. As part of his response, the respondent stated that he had worked for "Claim Pre-

vention Div." from April 1975 to February 1978. Claim Prevention Service, Jordan Service, Hubbard La Salle Clark Marine, and Consolidated Engineers were all companies that were owned by the respondent's father during the 1970's. In the questionnaire the respondent described the nature of the business as "security" and described his position as "supervisor." However, the respondent did not disclose that he had worked for the other companies his father owned or, as noted above, that while so employed he did work for attorneys conducting investigations, taking statements of witnesses, and serving subpoenas.

The respondent also did not list a company called Talk Softly, Ltd., in response to question 10(a). In May 1974, the respondent helped a girl he was dating rent an apartment at 4250 North Marine Drive in Chicago. The respondent agreed to put the lease in his name because his friend was not able to lease the apartment herself since she was unemployed. In submitting the lease application the respondent indicated that he was employed by Talk Softly, Ltd., was a vice-president of the company, and received an annual salary of between $16,000 and $20,000. The respondent had in fact invested in the company and was an officer. However, he never received any salary or commission because the company went out of business about nine months after it was incorporated. In testimony before the Hearing Board the respondent indicated that he told the rental agent that Talk Softly had recently been started by himself and several other individuals and that it had not yet produced any income. He maintains that the agent was fully advised of the facts.

Question 10(c) asked the respondent whether he had ever been accused by any employer, superior, or associate of dishonesty in connection with his employment. The respondent answered "No." The respondent admits that he failed to disclose that he was suspended from the

Chicago police department on March 22, 1973, for 10 days for failing to notify the department of a newly purchased car as required by a department rule, giving a false statement regarding the purchase of city and State vehicle licenses, and avoiding a possible penalty for a traffic infraction by falsely stating he was on official business. He maintains, however, that he was never accused of dishonesty by any employer. The respondent's March 22, 1973, suspension was contained in his personnel file from the Chicago police department.

Question 10(d) asked the respondent whether he had been discharged by any employer. It further stated, "If so, state the cause and the circumstances." The respondent answered that he had been discharged from the Chicago police department and stated that the cause was his "failure to obey a direct order."

The respondent had been a Chicago police officer from September 1970 to September 1975, when he was officially discharged. His discharge was the result of events that occurred on April 28, 1974. The respondent was off duty and on the medical roll at the time. The police board of the city of Chicago found that the respondent pointed a .38-caliber revolver at the head of a man and without justification struck and beat the man with a cane and a gun. The respondent also refused to obey the direct order of a supervisor to submit to a breathalizer test.

The respondent admits that he failed to fully state the cause for his discharge and the circumstances surrounding it. However, he states that this specific information was contained in his personnel file from the Chicago police department. A Chicago attorney and a member of the Committee on Character and Fitness (hereafter referred to as the commissioner), was assigned to the respondent's bar-application file. The commissioner reviewed the respondent's personnel file at po-

lice headquarters and was told by a captain or the head of personnel that the respondent's discharge was the result of a "personality conflict more than anything derogatory as far as his police duties." The commissioner testified that the respondent's personnel file contained 10 or 15 pages and that he assumed he had obtained the whole file. However, the respondent's personnel file, as it exists in the record on appeal, contains over 110 pages.

Question 11(a) asked the respondent whether he had ever been a party to any legal proceeding, either civil or criminal or quasi-criminal, including any proceedings in a juvenile court. Question 11(b) asked whether the respondent had ever been charged with a crime or arrested. The respondent answered "Yes" to both questions. He listed an August 1977 charge for possession of stolen goods. However, the respondent failed to disclose a 1968 arrest in Colorado for furnishing liquor to minors. The charge was later dismissed. Again, the respondent states that this information was contained in his personnel file from the Chicago police department.

Question 11(c) asked the respondent whether he had ever been charged with violation of any motor vehicle law, including any parking or other traffic violations. The respondent answered "Yes" and listed charges in October 1979 for failing to slow to avoid an accident and for assault. However, he failed to disclose 297 parking tickets that were issued to him over a period of 13 months from March 1979 to March 1980. The respondent admits that he should have included the tickets in his answer, but states that he did not attach much importance to them at the time he completed his questionnaire. The respondent testified before the Hearing Board that he did not know how many tickets he had, although he "was aware that there was a multitude of parking tickets."

Question 11(d) asked the respondent whether he had ever been summoned for violation of any other statute or ordinance. Question 11(e) asked whether the respondent had ever been involved in a bankruptcy proceeding. The respondent answered "No" to both questions. A warrant had been issued against the respondent in March 1980 for the 297 unpaid parking tickets. Apparently, though, the warrant was never served.

Question 16 asked the respondent whether he had ever been suspended, disqualified or otherwise disciplined as a member of any profession or in military service. The respondent was also asked whether he had ever been removed from any office, public or private, or whether any charges had been made or filed or proceedings instituted against him. The respondent answered "No" to both parts of the question. The respondent failed to disclose that when he was a Chicago police officer he was disciplined for reporting for duty late, losing his star while on duty, leaving the district without permission, and inattention to duty. In each instance he was either excused for one day without pay or required to work one day without pay.

The respondent also failed to disclose the following disciplinary measures that were imposed on him when he was a Chicago police officer. He received a 15-day suspension for leaving his duty assignment without permission, entering a tavern while on duty and in uniform, and submitting a false report regarding his duty status. He was suspended for 30 days for an off-duty incident that occurred while he was on the medical roll and which resulted in a court proceeding. The respondent received a 15-day suspension for being intoxicated while off duty. As previously noted, he was suspended for 10 days for failing to notify the department of a new car, giving a false statement regarding the purchase of his city and State vehicle licenses, and being involved in an off-duty

traffic incident in a suburban area and avoiding a possible penalty by falsely stating he was on official business. Finally, as mentioned above, the respondent was suspended for 30 days and then discharged for the incident in April 1974 in which he beat a man with a gun and refused to submit to a breathalizer test.

The respondent testified that, when he answered the first part of question 16, he considered "profession" to mean the traditional professions such as legal, medical, clergy, and possibly accounting. As to the second part of the question, he considered "office, public or private," to mean positions such as clerk of the court, member of the Hearing Board, or some other appointed or political office. The respondent testified that, since he had previously disclosed in the application that he had been discharged from the Chicago police department, he thought this question sought information relating to things other than employment matters. The respondent admitted, however, that when he became a police officer he signed an oath which stated that he was being appointed to the office of patrolman. In addition, he signed a copy of the Law Enforcement Code of Ethics which provided, "I recognize the badge of my office as a symbol of public faith."

The following facts are relevant to count II of the Administrator's complaint.

The respondent's bar application, which was received by the First District office of the Committee on Character and Fitness, was dated April 18, 1980. On June 26, 1980, the respondent executed a debtor's petition in bankruptcy which listed the American National Bank and Trust Company as an unsecured creditor in the amount of $7,500. This amount represented a student loan to the respondent which was guaranteed by the Illinois Guaranteed Loan Program. He also listed the city of Chicago as an unsecured creditor in the amount of

$5,940. This amount was a judgment which was entered against the respondent for the 297 unpaid Chicago parking tickets.

As a result of the bankruptcy petition the American National Bank and Trust Company declared the respondent's student loan to be in default in July 1980. In August 1980, the American National Bank and Trust Company was reimbursed by the Illinois Guaranteed Loan Program. The respondent subsequently reached an agreement with the Illinois Guaranteed Loan Program regarding repaying the loan.

The respondent testified that when he filed his bankruptcy petition his attorney advised him that the $7,500 student loan was nondischargeable in bankruptcy, but that he was required by law to list all debts, whether dischargeable or nondischargeable. The respondent also testified that he had tried to negotiate a settlement with the city of Chicago regarding his parking tickets. However, he was unable to reach a settlement and was advised by his attorney to declare bankruptcy.

In late August 1980, the Committee on Character and Fitness asked the respondent to send it his current employment information, his current home address and telephone number, and a printout of his motor vehicle violations from the Secretary of State. In October, the committee requested that the respondent arrange an interview with the member of the Committee on Character and Fitness above referred to as the commissioner. The respondent met with the commissioner on at least two occasions between October 7 and October 27, 1980.

The respondent testified before the Hearing Board that the commissioner asked him numerous questions about the felony charge which the respondent had listed in his questionnaire (possession of stolen goods), but that the commissioner did not inquire about the respondent's bankruptcy petition or his parking tickets. The respond-

ent also testified that he attempted to indicate to the commissioner the issue of parking tickets. However, the commissioner testified that he could not recall any discussion about parking tickets. The commissioner further stated that there was no reason for him to discuss parking tickets because the respondent had not listed any tickets in his questionnaire.

The respondent admits that he did not advise the commissioner or anyone else associated with the Committee on Character and Fitness of his unpaid parking tickets, of the fact that a judgment in the amount of $5,940 had been entered against him because of the unpaid parking tickets, of his June 1980 bankruptcy petition, or of his defaulted student loan. He maintains, however, that he was never asked whether he wanted to change any of his answers in the questionnaire. He also states that he was not advised by the Committee on Character and Fitness that he was under an obligation to amend his answers if any changes occurred after he filed the original questionnaire.

We turn to the respondent's first contention—that the findings and conclusions of the hearing and review boards are not supported by clear and convincing evidence. He maintains that, given his responses to the questionnaire, his signing of the release form, and the availability and actual production of his police department personnel file he cannot legitimately be accused of trying to hide anything from this court.

Rule 1—102(b) of the Code of Professional Responsibility provides that a lawyer may be disciplined "if he has made a materially false statement in, or if he has deliberately failed to disclose a material fact requested in connection with, his application for admission to the bar." (87 Ill. 2d R. 1—101(b).) Rules 1—102(a)(3) and 1—102(a)(4) warn that a lawyer shall not "engage in illegal conduct involving moral turpitude" or "conduct involv-

ing dishonesty, fraud, deceit, or misrepresentation." (87 Ill. 2d Rules 1—102(a)(3), 1—102(a)(4).) The Hearing Board concluded that the respondent violated these disciplinary rules. The Review Board concurred.

The facts in this cause are not in dispute. It is clear that the respondent did not fully and accurately complete the questionnaire which he submitted to the Committee on Character and Fitness. What is in dispute, however, is whether the respondent's conduct violated our Code of Professional Responsibility as alleged by the Administrator and, if so, whether the respondent should be disbarred as recommended by the Review Board.

A review of the record indicates that the facts which the respondent failed to disclose to the Committee on Character and Fitness may be divided into three categories. The first category consists of facts that were not disclosed in the respondent's questionnaire but were contained in his Chicago police department personnel file. Those facts include: (1) the four addresses of his residences which the respondent submitted to the police department, three of which were listed solely to comply with the department's residency requirement, even though the respondent did not reside there; (2) his 10-day suspension for failing to notify the police department that he bought a new car and for giving false statements; (3) the complete circumstances surrounding his discharge from the police department; (4) his arrest in 1968 for furnishing liquor to minors; and (5) the various punishments he received while working for the police department.

The respondent maintains that since the Committee on Character and Fitness knew or should have known of the facts contained in his personnel file at the time it approved his application, those facts may not be considered now. We agree that the respondent's misconduct as a police officer, itself, should not be considered when deter-

mining whether the respondent violated our Code of Professional Responsibility. However, we do believe that the nature of the facts contained in his personnel file may be considered in determining whether the respondent's failure to list those facts was deliberate.

The respondent appears to argue that his failure to fully and accurately complete the questionnaire should be excused because he signed the release in connection with his bar application. Pursuant to that release his personnel file was made available to the Committee on Character and Fitness in June 1980. However, at the time the respondent completed his questionnaire he had no way of knowing whether the committee would in fact request information from any of his past employers or from the Chicago police department, in particular.

The respondent also maintains that while there is an obligation of disclosure imposed on applicants, there is also an obligation of investigation imposed on the Committee on Character and Fitness. We do not agree. This is merely an attempt by the respondent to shift responsibility from himself to the committee. As we noted in *In re Ascher* (1980), 81 Ill. 2d 485, 499, the Committee on Character and Fitness lacks the personnel and resources to conduct independent examinations of bar applications. Thus, the committee must rely primarily on truthful and complete answers by applicants to its questionnaire as a source of material information.

The second category consists of facts which the respondent was aware of at the time he completed his questionnaire but which were not disclosed in the questionnaire or contained in his personnel file. These facts include: (1) the respondent's residence at 3200 Sheridan Road; (2) the work he performed for attorneys while employed by his father; (3) his employment by Jordan Service and other companies owned by his father in addition to Claim Prevention Service; and (4) his 297 unpaid

parking tickets.

The respondent admits that he did not disclose these facts in his questionnaire but, in essence, argues that they were not material. However, it is not an applicant's position to determine what information is or is not material to the inquiries of the Committee on Character and Fitness. An applicant must respond fully and accurately to the committee's questionnaire if the committee is to make a knowledgeable decision regarding the applicant's application. Certainly, it can be said that the respondent's 297 unpaid parking tickets, and his failure to list them, would be material to the committee's determination of whether the respondent possessed the required moral character and fitness to practice law.

The third category consists of events which occurred after the respondent completed his questionnaire but which he was aware of when he met with the commissioner of the Committee on Character and Fitness. The events include: (1) the judgment which was entered against him for not paying his parking tickets; (2) his filing of a debtor's petition; and (3) the resulting default on his student loan.

The respondent admits that he did not disclose these facts to the Committee on Character and Fitness but states that he was never asked whether he wanted to change any of his responses and was not advised that he was under an obligation to do so. However, the fact remains that, at the time the respondent met with the commissioner, several of his responses to the questionnaire were no longer accurate. It should have been evident that updated information was important to the committee, since it had requested his current home address and telephone number and current employment information. Furthermore, the respondent knew from the fact that he had been asked to meet with the commissioner that his application was still under consideration.

We agree with the Hearing Board's characterization of the respondent's attitude toward the admission process when it stated:

"Respondent appears to have approached the interviews with the Committee as an adversary proceeding in which his goal was to answer as narrowly as possible the questions which were asked, to volunteer no information, and to avoid giving full and candid answers which might have opened new avenues of questioning. This approach may be acceptable in an adversary situation, but it is not acceptable in the context of an application for admission to the Bar."

We find that when the facts which the respondent failed to disclose to the Committee on Character and Fitness are taken together, there is clear and convincing evidence to support the conclusion that the respondent made materially false statements in his questionnaire and deliberately failed to disclose material facts requested in the questionnaire. The respondent breached his duty to respond fully and accurately to all questions posed in the questionnaire. As we stated in *In re Ascher* (1980), 81 Ill. 2d 485, 501-02, "the character and fitness requirements of the legal profession are not met simply by ultimately delivering that which was wrongfully withheld originally." We hold, therefore, that the findings and conclusions of the hearing and review boards are supported by clear and convincing evidence.

The respondent's second contention is that the Review Board's recommendation of disbarment is excessive and not supported by the record as a matter of law. He maintains that, given his responses to the questionnaire, his signing of the release form, and the availability and actual production of his personnel file, his conduct does not warrant disbarment.

The purpose underlying attorney disciplinary proceedings is to "safeguard the public, to maintain the integ-

rity of the profession, and to protect the administration of justice from reproach." (*In re Nadler* (1982), 91 Ill. 2d 326, 333.) In determining the appropriate sanction to serve this purpose, we must balance the need to achieve uniformity in the application of discipline with the need to consider each case on its own merits. *In re Nadler* (1982), 91 Ill. 2d 326, 333.

The respondent cites numerous cases involving attorneys who engaged in misconduct such as fraud and misrepresentation and yet were not disbarred. However, none of these cases involved a pattern of conduct or surrounding circumstances sufficiently analogous to this cause. Furthermore, all of the cases involved misconduct by the attorneys after their admission to the bar and did not involve making false answers to and withholding information from the Character and Fitness Committee.

We believe that *In re Mitan* (1979), 75 Ill. 2d 118, cited by the Administrator, is relevant to the issue as to what measure of discipline is appropriate to this cause. In *Mitan*, as here, the Administrator alleged that the respondent had made numerous false statements and had deliberately failed to disclose certain information in his sworn questionnaire. The Review Board found that the respondent had failed to disclose at least four of his previous addresses, falsely stated his date of birth, did not disclose that he had changed his name, gave no information regarding a previous marriage, falsely stated that he had not attended any law school other than the one from which he received his degree and had not applied for admission to other State bars, failed to disclose at least five previous employers and occupations, and falsely denied involvement in any prior civil or criminal proceedings.

Here, as in *Mitan*, viewing each of respondent's inaccurate responses and omissions alone, they may appear to be insignificant. However, when those inaccurate re-

sponses and omissions are viewed together, they "present evidence of a calculated effort by the respondent to frustrate any meaningful examination and investigation of the applicant's fitness to practice law." (*In re Mitan* (1979), 75 Ill. 2d 118, 126.) "Even though we might accept respondent's explanation that mere inadvertence caused all of these falsehoods and omissions, we must, nonetheless, adhere to our recent holding that a bar applicant has a duty to accurately state matters contained in an application for admission. (*In re Martin-Trigona* (1973), 55 Ill. 2d 301.)" *In re Mitan* (1979), 75 Ill. 2d 118, 126-27.

The respondent has demonstrated a serious lack of concern for the truth. Not only did he display that character trait in answering the questionnaire, but also he evidenced that trait by the false statements to the police department concerning his residences and those made to the rental agency when he rented an apartment for his girlfriend. When asked why those addresses which he listed as residences with the police department were not listed on the character and fitness questionnaire, his explanation was that those were not really his residences. He just gave those residences to the police department to comply with a residency requirement.

> "Oh, what a tangled web we weave
> When first we practice to deceive!"
> *Marmion*, Sir Walter Scott.

Finally, the respondent draws our attention to the fact that there is no evidence that his practice of law since admission to the bar in 1980 has in any way been improper, unethical, or unprofessional. However, the Administrator's complaint alleged misconduct in connection with the respondent's application for admission to the bar. The Administrator had no burden to introduce evidence that the respondent engaged in misconduct after he was admitted to the bar.

For the above reasons, we find that the discipline recommended by the Review Board is warranted. It is therefore the order of this court that the respondent be disbarred.

*Respondent disbarred.*