IN THE MATTER OF LESTER KOTOK, AN ATTORNEY AT LAW.

Argued May 4, 1987—Decided August 11, 1987.

316

*William R. Wood,* Deputy Ethics Counsel, argued the cause for Office of Attorney Ethics.

*John J. Degnan* argued the cause for respondent (*Shanley & Fisher,* attorneys; *John J. Degnan* and *Robert M. Leonard,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

This is an attorney-disciplinary case. Respondent, Lester Kotok, was the subject of three separate complaints charging professional misconduct. One complaint, filed on February 3, 1982, alleged that respondent represented both parties to a real estate transaction in 1977, the year of his admission to the bar. A second complaint, filed on March 31, 1983, charged that respondent engaged in misconduct in the 1976 completion of his certified Statement of Candidate for admission to the Bar by inaccurately relating a 1975 conviction of a disorderly persons offense. The third complaint was filed on September 6, 1984, and alleged that respondent had engaged in misconduct by mischaracterizing, in a 1983 application to purchase a handgun, the 1975 disorderly persons conviction.

The District I Ethics Committee (Ethics Committee) held separate hearings for each complaint and recommended a public reprimand, a private reprimand, and another public reprimand respectively. Those recommendations were forwarded to the Disciplinary Review Board ("DRB"), which held hearings on May 16, 1984, and May 21, 1986. The DRB issued its decision on January 15, 1987, and recommended a one-year suspension in connection with the first and second complaints but found no basis for discipline in connection with the third complaint. These matters were brought before this Court on an order to show cause why respondent should not be disbarred or otherwise disciplined pursuant to Rule 1:20–5.

I.

We have independently reviewed the record in this case and, except for its determination of ultimate facts with respect to

the third complaint, we are in substantial agreement with the findings of the DRB. We can therefore draw upon the DRB's presentation of the matter as reflected in its Decision and Recommendation. We deal first with whether the evidence of record clearly and convincingly demonstrates ethics violations. We then consider the matter of necessary and appropriate discipline.

A.

The first allegation of misconduct relates to an asserted conflict of interest. Within a month after his admission to the bar in June 1977, respondent was contacted by Alfred Swangler regarding the filing of a workers compensation claim. Respondent looked into the matter and determined that nothing more could be done at that time. Respondent was next contacted by Swangler in September 1977 on behalf of Mr. and Mrs. Ernst J.V. Olsen, who wanted an attorney to prepare their wills and a property deed. Mr. Olsen, 90, and Mrs. Olsen, 82, were living with the Swanglers.

According to the DRB:

Respondent later met with Mr. Olsen in his law office. Olsen wanted a property deed prepared transferring their 22-acre farm to Mr. and Mrs. Swangler. He also wanted their wills to designate the Swanglers as beneficiaries to their estates. During this conversation, Mr. Olsen referred to the Swanglers as the "kids." Olsen said that he had no relatives in this country but had a distant cousin in Europe whom he never saw. Olsen did not want his property to escheat to the state after he died. Olsen also said the "kids" were good to him, took care of him and he loved them and wanted to give them everything he had. The Olsen home was in a state of disrepair. Respondent maintained that he discussed with Olsen the effect of signing a deed and questioned why the Olsens wanted to deed the property to Swangler and also to make the same provision in their wills. According to respondent, Olsen fully understood what he was doing and the nature of his act. Olsen said that Swangler had been injured, was out of work, and he wanted Swangler to have the property. At some later point, Olsen telephoned respondent. He was upset that the wills and deed had not yet been completed.

Having prepared the wills, respondent arranged to meet Mrs. Olsen at the hospital where she would be visiting Swangler who was hospitalized. Respondent met with her privately and informed her that he had not completed the deed. He then explained the wills to her "paragraph by paragraph by para-

graph." Mrs. Olsen did not sign her will at that time because she wanted to talk to her husband, who was at the Swangler residence. Respondent explained to her that the wills had to be signed in the presence of two witnesses and dated. Respondent maintained he had no difficulty communicating with her nor did he perceive any problem of her understanding what he said. Respondent maintained that Mrs. Olsen was lucid and had asked him questions about the will.

On October 11, 1977 respondent went to the Swangler residence with the deed. Swangler summoned Mrs. Olsen, calling her "Mom." Respondent explained the deed to the Olsens and that their wills would accomplish the same effect except they were revocable whereas the deed was not. Mr. Olsen needed a magnifying glass to read the deed. This glass was obtained by one of the Swangler children who referred to Mr. Olsen as "Grandpop."

According to respondent, Mr. Olsen insisted on going ahead with the transaction and was upset with respondent for repeatedly reviewing the will and deed. The Olsens executed the deed and subsequently delivered the wills, already executed and witnessed by persons who were friends of the Swanglers. Later, in November 1977, respondent represented Swangler in prosecuting his workers compensation claim. In 1978, the Swangler's sold the Olsen property. While respondent did not actually handle this sale, he did render services to the Swanglers by filing motions to clear judgments against Swangler so that the property sale could be completed.

The DRB recapitulated the testimony adduced at the Ethics Committee hearings. We have reviewed this evidence and find it probative, *viz:*

At the ethics proceeding, three witnesses testified that the Olsens had not fully comprehended that they had deeded their property to the Swanglers. Joseph W. Smith, a neighbor of the Olsens, had seen them in 1978 and 1979 and they consistently denied giving their property away. Atlantic County Prosecutor's Office Investigator Deborah Deibler also was told this when she investigated a complaint involving this matter. She had seen the Olsens in late 1977. David M. Van Sant, a senior Atlantic County Welfare Board investigator, interviewed the Olsens in 1979 in a county nursing home. Van Sant concluded that the Olsens believed they still owned their property. In his opinion the Olsens were debilitated, somewhat disoriented and suffered hearing loss and poor vision.

At the ethics proceedings, the hospital records were admitted into evidence. Concerning Mrs. Olsen, the records indicated that she had been hospitalized between August 24 and September 7, 1977. Mrs. Olsen was unable to sign on admission. Swangler was listed as being her grandson on the admission

summary sheet. The records revealed that as of September 7, 1977 she continued to have memory loss. Concerning Mr. Olsen, the records indicated that he was hospitalized from August 19 through September 7, 1977. The admissions summary sheet indicated that he was unable to sign on admission. Mr. Olsen was again hospitalized on November 3 1977. The nurse's notes for the November admission indicated that Mr. Olsen was accompanied by his "grandson."

At the ethics proceedings Swangler testified that he had known the Olsens for about 26 years, having first met them when he was about 14 years of age. He believed he first met respondent in 1978. Respondent first did legal work for him in 1978 concerning his injury and his worker's compensation claim. Swangler stated he sold the Olsen property because he needed money for his bills. He claims he sold the property in April 1978 for $25,000. He maintained he used some of the proceeds on behalf of the Olsens. Swangler contended that he and his wife visited the Olsens on about a daily basis but stopped because of newspaper publicity which suggested he and his wife had taken advantage of the elderly Olsens. He stated that no one had advised him of Mr. Olsen's death. He was not aware that Mrs. Olsen had also died. At the ethics proceeding, Swangler acknowledged that he had been convicted of issuing worthless checks, welfare fraud and forgery.

On these facts, the Ethics Committee concluded that respondent had represented two parties to the same transaction without making proper disclosure to the Olsens concerning their rights and obligations. The DRB concurred. We find it indisputable that respondent's conduct resulted in an unethical conflict of interest with serious adverse consequences to the Olsens who impoverished themselves as a result of not having had independent counsel or having been fully informed as to their interests. *See Matter of Dolan,* 76 *N.J.* 1 (1978).

We conclude that the evidence is clear and convincing that respondent engaged impermissibly in a professional conflict of interest, in violation of Disciplinary Rule 5–105 and Disciplinary Rule 1–102(A)(6). Discipline is required.

## B.

The second complaint relates to a Bar admission statement. In October 1974, respondent armed himself with a pistol and went to his chiropractor's office to obtain x-rays. A confrontation occurred, respondent drew the pistol and threatened the doctor. Respondent was promptly arrested on armed robbery

and weapons charges. In December 1974, respondent was indicted for possession of a pistol without a permit and for malicious assault. After negotiations with the prosecutor, respondent, in June 1975, pled guilty to the disorderly persons offense of possession of a weapon with intent to assault, contrary to *N.J.S.A.* 2A:170-3. Respondent's sentence was a $250 fine, two years unsupervised probation, and community service.

On August 20, 1976, respondent, while still on probation, filed a certified Statement of Candidate with the Committee on Character for his admission to the Bar. He completed questions X(b) and X(d) on this Statement.[1]

The actual questions and respondent's answers are as follows:

X(b). Have you ever been charged with, arrested for, or convicted of, the violation of any law? Yes.

X(d). If you answered yes to A, B, or C, state the nature of the proceeding and give full details, including dates, case numbers, name and location of court, if any, references to court records, facts and disposition. Include all such incidents, except for minor traffic violations. See attached supplement.

*Supplement to Page 8, Question X (b)*

While working as a private investigator in Florida, I legally purchased a pistol and was licensed to carry same. Upon moving back to New Jersey, I mistakenly forgot to register that pistol with the proper New Jersey Authorities.

In May of 1974, I was arrested and eventually charged with the Disorderly Person Offense of possession of a weapon without a permit. The matter was heard before the Honorable Herbert Horn, then Assignment Judge of Atlantic County.

---

[1]The instructions on the form directed respondent to be candid and complete in his answers:

*INSTRUCTIONS TO CANDIDATE:* This statement is intended to provide the Committee on Character with information relevant to your fitness to practice law. Candor and truthfulness are significant elements of such fitness. You should, therefore, provide the Committee with all available information, however unfavorable, even if its relevance is in doubt, and disclosure should be as detailed as possible. The Certified Statement of Candidate is confidential, and is intended for use only at the direction of the Supreme Court.

Judge Horn heard all of the facts in the case and did accept a guilty plea to the offense. After accepting the plea, Judge Horn did state: "I would like the record to show that I am sorry to see such a small mistake blot the record of someone with an obviously fine history, however, this defendent [sic] has plead [sic] guilty to a disorderly persons offense and I do not feel that it will interfere with his attempts to join the legal profession."

On September 17, 1976, the Supreme Court Committee on Character determined that respondent was fit to practice law, and respondent was admitted as a member of the Bar in 1977.

On March 31, 1983, an ethics complaint was filed against respondent relating to this certification. The complaint charged respondent with failing to give required details concerning his conviction, willfully misstating material facts, and misrepresenting to the Committee on Character the sentencing court's true opinion of respondent's actions. The Ethics Committee concluded that respondent had not failed to disclose material facts to the Committee on Character. It stated that respondent's

failure to disclose further information concerning the criminal matter in question may have been attributable to respondent's inexperience, ignorance as to the Rules of criminal procedure, and the advice received from counsel.

The Committee did conclude that the quote attributable to the trial court was a "willful and self-serving misstatement of a material fact." · Nevertheless, the panel stated that it had difficulty finding that respondent had willfully or intentionally made that misstatement to misrepresent to the Committee on Character the sentencing court's true opinion of respondent's actions.

The DRB disagreed with the Ethics Committee, making the following findings:

At the ethics proceedings, respondent's criminal defense attorney stated it was never respondent's intention to plead guilty to any crime that he assaulted the chiropractor. However, he testified he did not care what disorderly persons offense respondent pleaded to as long as it was a disorderly persons offense and disposed of the case. The attorney stated he did not review the provisions of *N.J.S.A.* 2A:170-3 with respondent before respondent pleaded guilty to the charge. Although he could not recollect the exact words of a conversation between respondent's father, the judge and himself, his impression of what the judge said was that the plea would not interfere with respondent's attempt to join the legal profession. Respondent's father testified the judge had made a

statement indicating he was pleased the matter was to be resolved the way it was because the judge did not want to see anything interfere with respondent's career.

The sentencing judge, however, denied making the statement. He told the ethics panel:

> that phrase, to see such a small mistake, I never considered this as a small mistake. Anybody with a weapon, it was a large mistake, especially, a law student at the time. So I would never have said that. "Fine history," I knew nothing about him, except that he was a law student and was working hard from what his father told me. His father would be prejudiced to a certain extent, naturally, and, therefore, I would not have accepted "fine history" as a truism.
>
> And, finally, "that I do not feel it will interfere with his attempts to join the legal profession ..." I would never get into that area at all. That was not my domain and I would not comment on it as a matter of principle, let alone anything else. That's for somebody else. So, for those reasons, I don't believe that I ever said it.

Respondent testified he had been told by his criminal defense attorney that he would be pleading to a charge of possession of a weapon without a permit. He maintained that at the time he had no "intimate" knowledge of the New Jersey criminal statutes or of disorderly persons offenses. He contended he never intended to plead to a charge involving any assault or a charge involving use of a weapon. When he completed the certified statement for admission to the bar, respondent said he had not seen his criminal file and he had answered the question in issue "strictly from memory." At the hearing, respondent stated the only inconsistency he saw in his statement was that the phrase "on the record" should not have been included because the judge's statement was not on the record. Respondent maintained the quote of the judge's statement was based upon his best recollection and upon his rememberance of discussions with his father and his defense attorney.

We agree with the DRB that respondent concealed from the Character Committee his arrest for armed robbery and for weapons violations, and his indictment for possession of a pistol without a permit and for assault. Respondent concealed this information even though question X(b) specifically asks for information about arrests and charges, as well as convictions. In addition, respondent's answer misstated the offense for which he was convicted; it misleadingly conveyed the impression that he legally owned the pistol and that he was convicted for a minor disorderly persons offense merely because he forgot to register it upon his return to New Jersey. Respondent's argument that this conduct may be attributed to youth and immaturity or to misguided advocacy and not to an intent

to mislead is unpersuasive. Respondent was, at the time, a twenty-seven-year old law school graduate. He was sophisticated enough to understand fully his obligation to tell the truth. Respondent knowingly chose not to discharge that obligation. Moreover, respondent has consistently refused to acknowledge wrongdoing. In his verified Formal Answer, dated May 13, 1983, respondent stated that his response on the character statement was full and candid. At the hearing before the Ethics Committee on July 26, 1983, respondent said:

Q Were you entirely truthful in your recitation?
A I sure was.

 \* \* \* \* \* \* \* \*

A When I first answered the question I thought I went overboard ...

 \* \* \* \* \* \* \* \*

Q I assume you're saying you were deficient then by way of hindsight.
A No. I was deficient in that I didn't give the specifics, the docket number or anything like that, yes. I didn't have them to give.

We find the evidence to be clear and convincing that respondent gave untrue answers in seeking admission to the bar, in violation of Disciplinary Rule 1–101(A). This form of unethical conduct can, and should, be the subject of formal discipline. *See, e.g. Matter of Scavone,* 106 *N.J.* 542 (1987); *Application of Jenkins,* 94 *N.J.* 458 (1983); *Application of Matthews,* 94 *N.J.* 59 (1983).

### C.

In September 1984, the third ethics complaint was filed against respondent. It charged respondent in count 1 with knowingly providing false information to a municipal police chief in an application for a permit to purchase a handgun and, in count 2, with knowingly exerting influence on police personnel in order to expedite and assure approval of this application.

In March 1983, respondent was appointed as the municipal court judge of Bridgeton. On November 4, 1983, he filed an application for a permit to purchase a handgun. In response to a question on the application form asking whether the applicant

had ever been a juvenile delinquent or disorderly person, respondent replied in the affirmative. He listed the year as 1973, and the offense as possession without a permit. To a question asking whether he had ever been convicted of a crime, respondent answered no. Respondent's application was approved by the municipal police chief on December 5, 1983.

On March 22, 1984, respondent completed an application for a permit to carry a handgun. In response to a question on the application form asking whether he had ever been adjudged a juvenile delinquent or disorderly person, respondent replied in the affirmative. He listed the date as June 25, 1973, and the offense as "2A:170–3." The municipal police chief approved respondent's application, which would then be forwarded to a Superior Court judge for approval or denial.

At the ethics proceeding, respondent testified that on November 4, 1983, he asked the municipal police chief for an application for a permit to purchase a handgun. Respondent was given an application and filled it out while standing in the chief's office. Respondent stated that before he prepared the later application for a permit to carry a handgun, he contacted the secretary of his attorney and was informed that the offense for which he pled guilty was *N.J.S.A.* 2A:170–3. The Ethics Committee noted that the ethics hearing

concerning the Respondent's conduct in completing the Certified Statement of Candidate was conducted on July 25 and July 26, 1983 and there was before that Panel the very same issue as is before this Panel. There had passed just three months and 9 days since that hearing. Assuming Respondent did not recall the offense to which he had pled guilty, it is inconceivable he did not ascertain during the July 25 and 26, 1983 hearings the exact description of the disorderly person offense to which he pled guilty. He was at that time a Judge of the Municipal Court, having been appointed to that position in March, 1983 and, as such, he had been dealing on a day-to-day basis with the disorderly person statute of this State. His assertion that he did not consciously or willfully misstate anything in this application is not believable.

The Ethics Committee concluded that respondent knowingly provided false, deceptive, and incomplete information to the Bridgeton police department, contrary to Disciplinary Rule 1–102(A)(3, 4, 5) and (6). It recommended public discipline. It

also concluded that the record was devoid of any evidence that respondent exercised improper or undue influence in obtaining approval of his application to purchase a handgun.

The DRB disagreed, finding that the evidence did not clearly and convincingly establish that respondent deliberately misstated the offense so that he could obtain a handgun purchase permit. It noted that possession of a pistol without a permit is not a disorderly persons offense but an indictable crime, a high misdemeanor. *N.J.S.A.* 2A:151–41(a). The DRB reasoned therefore that the inclusion of this charge on the application form was, in effect, against respondent's interests because, if accepted at face value, it would disqualify respondent from obtaining such a permit. *See N.J.S.A.* 2C:58–3c (no handgun purchase permit or firearms purchaser identification card shall be issued to "any person who has been convicted of a crime.") The DRB reasoned further that the municipal police chief was not misled by this error because he knew of respondent's conviction of the disorderly persons offense. Moreover, when respondent completed the application to carry a handgun, he listed the offense as "2A:170–3," which is the correct citation.

We cannot agree completely with the determination of the DRB. The application form for a handgun purchase permit warns that submission of false information is a crime. Moreover, only three months earlier, respondent had been involved in ethics hearings involving the identical offense. Thus, respondent's description of his 1975 disorderly persons conviction as possession of a weapon without a permit was incorrect and untrue. The inference is clear, and we draw it, that respondent knew that this answer was false. However, the purpose and effect—the motive for this misstatement—remain unclear. As mentioned, respondent's answer denotes the commission of a crime, not a disorderly person's offense. In addition, as found by both tribunals below, respondent did not consciously seek improperly to influence any official actions. Finally, the identical question in the succeeding application for a permit to carry

was answered truthfully by reference to the correct statutory provision.

In sum, the evidence demonstrates clearly and convincingly that respondent gave a knowingly false answer, although not with an obvious purpose to mislead, in completing the application to purchase a weapon. This is a violation of Disciplinary Rule 1–102(A)(4), and merits discipline.

## II.

We now turn to the matter of the nature and extent of discipline. The ultimate goal in disciplinary proceedings is to preserve the confidence of the public in the integrity and trustworthiness of lawyers. To this end, the discipline to be imposed must reflect the gravity of the misconduct in light of all relevant circumstances. *Matter of Nigohosian*, 88 *N.J.* 308, 315 (1982). Consideration must be given to the interests of the public, the bar, and the individual involved. *Matter of Kushner*, 101 *N.J.* 397, 400 (1986). We are mindful of factors relating to the attorney's professional record, reputation and general character. *Matter of Litwin*, 104 *N.J.* 362, 365 (1986); *Matter of Infinito*, 94 *N.J.* 50, 57 (1983).

In the Olsen matter, the record demonstrates by clear and convincing evidence that respondent failed in his professional duties to his clients. Although respondent maintains that he had explained the significance of both the wills and the deed to his elderly clients, the record discloses that the Olsens had not fully understood what they were told. Three disinterested witnesses testified to that effect. In the deed transaction, respondent represented both the grantors and the grantees without advising either party to seek independent counsel. Respondent should have explained in detail to both parties the potential conflict of interest so that they could intelligently decide the necessity of obtaining separate counsel. *Matter of Dolan, supra*, 76 *N.J.* 1; *see In re Kamp*, 40 *N.J.* 588 (1963). In failing to avoid or rectify this conflict of interest, respondent

did not adequately safeguard the interests of the Olsens when they conveyed their property to the Swanglers. Apparently, the Olsens died penniless and were buried in donated burial sites. Respondent's misconduct violated Disciplinary Rule 5–105 and Disciplinary Rule 1–102(A)(6). Ordinarily, we would be justified in suspending respondent from the practice of law for one year.

In the second matter, respondent had pleaded guilty to a disorderly persons charge of carrying a weapon, a revolver, with intent to commit an assault, contrary to *N.J.S.A.* 2A:170–3. In his certified statement in connection with his application for admission to the Bar, respondent stated that he was convicted of the disorderly persons offense of "possession of a weapon without a permit." He did not supply details of this violation. His description of the offense was false. Further, respondent included a purported quote of the sentencing court, stating that the offense was not serious and should not interfere with his admission to the Bar. At the ethics proceedings, respondent maintained that he drafted this quote from memory. However, neither the testimony of the sentencing judge nor the transcript of the plea supports respondent's position. Rather, the record demonstrates by clear and convincing evidence that respondent knowingly misrepresented a direct statement, which he attributed to the trial court, on his certified statement to the Committee on Character. This clearly was an attempt by respondent to minimize the seriousness of the criminal offense to which he had pleaded guilty.

Membership in the Bar is a privilege burdened with conditions. *Application of Matthews, supra,* 94 *N.J.* at 75; *In re Pennica,* 36 *N.J.* 401 (1962). In completing the certified statement, it is the applicant's burden to disclose the facts fully and accurately. In *In re Hyra,* 15 *N.J.* 252 (1954) we noted:

A full disclosure of one's personal life and his affairs should be made by every prospective candidate and it can be generally stated that there is no place in the law for a man who cannot, or will not, tell the truth even when his own

interests are involved. In the legal profession particularly there must be reverence for truth. [*Id.* at 253–254.]

It is not the burden of the Committee on Character to ferret out the truth. *See In re Jordan,* 106 *Ill.*2d 162, 88 *Ill.Dec.* 1, 6, 478 *N.E.*2d 316, 321 (1985).

■ We concur in the DRB's conclusion that respondent breached his duty to respond fully and accurately to all questions posed in the Bar admission form. Respondent's misconduct violated Disciplinary Rule 1–101(A). We would, if presented with this ethics violation in advance of Bar membership, be justified in withholding admission. *See, e.g., Application of Jenkins, supra,* 94 *N.J.* 458; *Application of Matthews, supra,* 94 *N.J.* 59. In this case, however, since respondent has been admitted to the Bar, the appropriate discipline is to revoke respondent's license to practice law. *See, e.g., Matter of Scavone, supra,* 106 *N.J.* 542.

■ Concerning the application for a permit to purchase a handgun, the subject of the last complaint, the determination of appropriate discipline is more problematic. While respondent revealed on the application form his disorderly persons conviction, he misstated the offense as possession without a permit. False statements in connection with such applications violate Disciplinary Rule 1–102(A)(4) and warrant stern discipline that can include suspension. *See, e.g., Matter of Pleva,* 106 *N.J.* 637 (1987). In this case, however, as noted by the DRB, respondent did not benefit from the misstatement on his application form. Moreover, when respondent answered the identical question on the application for a permit to carry a handgun, he correctly identified the offense for which he was convicted as "2A:170–3.-" In these circumstances, respondent's lack of candor in giving the false answer, rather than an intent to deceive or to influence official action, appears to be the major transgression. Consequently, we hold that respondent's conduct warrants a public reprimand.

█ In imposing discipline for these several ethical breaches, we are admonished to consider mitigating factors. Severe discipline otherwise justified by serious infractions may be tempered by mitigating considerations. Here, it is relevant to note that respondent was admitted to the Bar in 1977 and has had no disciplinary history other than the matters now before us. He has apparently served and continues to serve his community as a municipal court judge.

█ In addition, in this case we are impelled to consider the efficacy of any sanction in light of the amount of time that has passed since the ethics violations occurred. If the ethics transgressions are remote in time, intervening developments and current circumstances may require an assessment of whether usual sanctions, otherwise appropriate, will effectively serve the purposes of discipline. Recognizing such concerns, we have on occasion imposed discipline retroactively, indirectly crediting a respondent to a period of suspension already served. *E.g.*, *Matter of Noonan*, 102 *N.J.* 157 (1986); *Matter of Verdiramo*, 96 *N.J.* 183 (1984); *Matter of Strickland*, 87 *N.J.* 575 (1981). We have sometimes imposed less discipline than would otherwise be required in view of a previously imposed, continuing suspension. *E.g., Matter of Templeton*, 99 *N.J.* 365 (1985). In special circumstances, we have permitted our written opinion determining wrongdoing to suffice as a form of discipline. *E.g., Matter of Hinds*, 90 *N.J.* 604 (1982). In such cases, the Court was satisfied that the particular disposition was adequate to protect the public, discourage future misconduct, and encourage the rehabilitation of the errant lawyer.

█ With these concerns in mind, we must determine whether the discipline that would otherwise be required for the violations in this case should be influenced by the remoteness of the infractions. To reiterate, we are satisfied and determine that respondent's conduct involving the conflict of interest warrants suspension from the practice of law for a period of one year. The false statement on the Bar application justifies

the conditional or provisional revocation of respondent's license to practice law. Finally, respondent's inaccurate disclosure on the application to purchase a handgun warrants a public reprimand.

However, with respect to the offenses committed by respondent involving the conflict of interest and the false Bar application answer, considerations of remoteness lead us to conclude that the goals and purposes of discipline will not be advanced by imposing the suspension or the conditional revocation of respondent's license to practice law. These offenses occurred almost ten years ago when respondent had just entered the legal profession. In the intervening years, respondent has gained professional experience, skill and understanding. He has achieved a commendable level of professional competence and recognition as evidenced by his appointment and service as a municipal court judge. Thus, in these circumstances, one of the purposes of discipline, namely, to encourage the rehabilitation of the offending lawyer, has in some measure been accomplished through the passage of time. The imposition of current disciplinary sanctions involving suspension or license revocation would appear counterproductive in terms of the rehabilitative goal of discipline. Nevertheless, we cannot in any sense condone these past transgressions by imposing no discipline at all. Some form of sanction is required with respect to these remote offenses in order that the overall goal of attorney discipline, the vindication of the public interest, be met.

We now hold, under the limited circumstances presented by this case, that respondent can be appropriately disciplined by the imposition of a probationary sanction embracing suitable conditions designed to further the goals and purposes of the attorney-disciplinary system. We believe that these goals will be served most efficaciously by requiring respondent to engage in community legal service. Community service can constitute an affirmative condition of probation that can serve to deter by reminding the offender and others of the offense, to rehabilitate by according the offender an opportunity to contribute to

society, and in some measure to redress the injury to society by addressing community needs.

We note that the imposition of a probationary sanction embracing specified conditions, as an alternative to traditional attorney discipline, has been specifically approved by the American Bar Association. AMERICAN BAR ASSOCIATION CENTER FOR PROFESSIONAL RESPONSIBILITY, STANDARDS FOR IMPOSING LAWYER SANCTIONS (1986). Further, the efficacy of this disciplinary alternative has been recognized by several jurisdictions that provide for the limited imposition of probationary periods. *See, e.g., Finch v. State Bar,* 28 *Cal.*3d 659, 170 *Cal.Rptr.* 629, 621 *P.*2d 253 (1981); *The Florida Bar v. Montgomery,* 418 *So.*2d 267 (Fla.1982); *The Florida Bar v. Brennan,* 411 *So.*2d 176 (Fla.1982); *Attorney Grievance Commission of Maryland v. Finlayson,* 293 *Md.* 156, 442 *A.*2d 565 (1982); *In re Schiff,* 542 *S.W.*2d 771 (Mo.1976); *In re Privette,* 92 *N.M.* 32, 582 *P.*2d 804 (1978); *In re Scannell,* 289 *Or.* 699, 617 *P.*2d 256 (1980). We also note that the imposition of community service in the context of the administration of criminal justice has added flexibility in terms of criminal punishment and has become fairly common. *See, e.g., State v. Gardner,* 215 *N.J.Super.* 84 (App.Div.1987); *State v. Tirelli,* 208 *N.J.Super.* 628 (App.Div.1986); *State v. Hakim,* 205 *N.J. Super.* 385 (App.Div.1985); *State v. Rednor,* 203 *N.J.Super.* 503 (App.Div.1985); *State v. Saperstein,* 202 *N.J.Super.* 478 (App.Div.1985); *see also N.J.S.A.* 2C:43–12 to –13 (pretrial intervention statutes).

■ Accordingly, we determine and rule that the imposition of the one-year suspension and conditional revocation of respondent's license are suspended, and respondent is placed on probation for the length of the term of suspension from practice, namely, one year. The condition of probation shall be that respondent must perform legal services of a community nature consisting of the equivalent of one-day per week. These services shall be performed under the supervision of the Office of

Attorney Ethics. Such services shall be rendered on behalf of Legal Services or, upon application to the Office of Attorney Ethics, a comparable community services organization. Upon the satisfactory performance of the terms of probation, respondent's probation shall be discharged.

 With respect to the third violation, involving the inaccurate gun purchase permit application, this offense occurred in 1984. Considerations of remoteness do not justify modification of appropriate discipline. We therefore determine that respondent be publicly reprimanded for this offense. In addition, this offense occurred while respondent was a municipal court judge and adversely reflects upon his judicial role. Thus, we consider it appropriate to remand this matter to the Advisory Committee on Judicial Conduct for its consideration and recommendation as to any further discipline it may deem necessary. *Cf. In re Mattera*, 34 *N.J.* 259 (1961) (the sanction of impeachment of a municipal court judge does not preclude the imposition of other discipline for the attorney's misconduct).

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the production of transcripts.

So ordered.

## ORDER

This matter having come before the Court on the recommendation of the Disciplinary Review Board for the final discipline of LESTER KOTOK of BRIDGETON, who was admitted to the bar of this State in 1977, and the Court having concluded that the goals and purposes of discipline will not be advanced by imposing the discipline otherwise warranted in two instances because of considerations attendant to the remoteness in time of these occurrences, and the Court having determined that 1) LESTER KOTOK's conduct involving the conflict of interest created by his commencement of representation of certain clients in 1977 would otherwise warrant a one-year suspension

and 2) his false statement on his bar application would otherwise justify the conditional revocation of his license to practice law; it is

ORDERED that the imposition of the one-year suspension and conditional revocation of LESTER KOTOK's license are suspended; and it is further

ORDERED that LESTER KOTOK is placed on probation for one year with the condition that he perform legal services of a community nature consisting of the equivalent of one-day per week with such services to be performed under the supervision of the Office of Attorney Ethics and to be rendered on behalf of Legal Services, or upon application to the Office of Attorney Ethics, a comparable community service organization; and it is further

ORDERED, upon the satisfactory performance of the terms of probation, LESTER KOTOK's probation shall be discharged; and it is further;

ORDERED that LESTER KOTOK is publicly reprimanded for his misstatement on his gun purchase permit application in 1984; and it is further

ORDERED that the matter involving the gun purchase permit application is remanded to the Advisory Committee on Judicial Conduct for its consideration and recommendation as to any further discipline it may deem necessary; and it is further

ORDERED that LESTER KOTOK reimburse the Ethics Financial Committee for appropriate administrative costs, including the production of transcripts.

*For Public Reprimand*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN, JJ.—7.

*Opposed*—None.